Reverend John M. PERKINS et al.,
Petitioners-Appellants,

v.

STATE OF MISSISSIPPI,
Respondent-Appellee.

No. 30410.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1972.

Rehearing En Banc Granted
June 2, 1972.

John R. Brown, Chief Judge, dissented and filed opinion.

Frank R. Parker, Lawyers' Committee for Civil Rights Under Law, Constance Iona Slaughter, Lawrence D. Ross, Jackson, Miss., for petitioners-appellants.

A. F. Summer, Atty. Gen., G. Garland Lyell, Jr., Asst. Atty. Gen., Jackson, Miss., for respondent-appellee.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and CLARK, Circuit Judges.

COLEMAN, Circuit Judge:

This is a case to which we must apply the provisions of Title I of the Civil Rights Act of 1968, 18 U.S.C. § 245, and

the teachings of Greenwood, Miss. v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966).

The appellants were charged in state courts with a variety of misdemeanors such as reckless driving, resisting arrest, interfering with an officer, and the like. The offenses allegedly occurred in Rankin County, the arrests were made in that county, and the charges were brought in that county. Previously, on the same day, the appellants had participated in Simpson County in a peaceable march in support of a "boycott" directed against alleged racial discrimination. They were neither arrested nor charged with an offense in that county. They sought to remove their cases to the United States District Court. After an extensive evidentiary hearing the District Court found as a fact that as to the pending state charges the parties had not been denied a right guaranteed by the Constitution of the United States and that there was nothing to indicate that they could not receive a fair and impartial trial in the state courts. These cases were accordingly remanded and this appeal followed. Considering the credibility choices which are left to the trier of the fact, the findings below are supported by the evidence. Therefore, the judgment remanding the cases for trial in the state courts is affirmed.

Very few, if any, of the appellants were residents of either Simpson or Rankin County. Most of them were students at Tougaloo College, near Jackson. Mendenhall, the county seat of Simpson County, is about forty-five miles southeast of Jackson, on U. S. Highway 49. The Mendenhall boycott, with its accompanying marches or demonstrations, had been going on for about a month. The students had been commuting back and forth to lend their assistance.

All of the appellants but three were arrested on U. S. Highway 49 while returning from Mendenhall to Jackson.

The remaining three were arrested several hours later at the Rankin County Jail in Brandon after they had gone there of their own accord at night, after visiting hours, armed with a shotgun, two rifles, and a pistol.

We consider first the case of those arrested on the highway.

Douglas O. Baldwin, called by the appellants as an adverse witness, was the sole arresting officer. Baldwin is a Patrolman with the Mississippi State Highway Patrol. He testified that he was not in Mendenhall on the day of the later arrests. Prior to the arrests he knew nothing of the identity of the parties. Specifically, he stated as follows:

"When I came from supper that night I got behind two vans. One was a Dodge van, and the front van was weaving in and out all over the road and I got in between them. The front van was making about 45 or 50 miles an hour, and a car was passing us, we were in a four lane, we were in the outside lane. And this car passed us on the inside lane and he liked (sic) to have hit the car and I stopped him [Huemmer] and got him out, and I didn't know he wasn't the only one in the truck."

The Trial Judge then asked Officer Baldwin how many persons were in the van and Baldwin replied:

*"Twenty.* When I got him out and got him back in my car I saw two Negro boys in the back of it [the van] looking out the back window and I didn't think nothing (sic) about it then, but one of them got out of the truck and started coming back toward my car and I got out of my car and told him to get back in because I was the only Patrolman there and I didn't know what he might do. He went back toward the truck and I looked back again and there were eight or ten or twelve of them out there then, so I started calling for help [on the patrol car radio]. I didn't know what they might try to do."

Baldwin further testified that he had eaten supper that evening and had then resumed his patrolling on Highway 49

North. When asked if he knew that the occupants of the vans were some of the marchers from Mendenhall he replied, "No, Sir, I didn't have any idea. I didn't know that there was but one person in that truck".

The Court then propounded the following question:

"When you arrested these people did you know they were the Mendenhall marchers?

"Answer: No, Sir."

██ Baldwin further testified that his reason for stopping the van was because it was weaving as if the driver was drunk, that it crossed the center line several times, once almost hitting another automobile. This was a valid arrest for reckless driving, Barnes v. State, 249 Miss. 482, 162 So.2d 865 (1964); Section 8175 Mississippi Code of 1942.

Baldwin further testified that he had received no radio message to stop the van. It was not until all the individuals had gotten out of the van that he recognized he had stopped people associated with the demonstrations in Mendenhall. When these individuals got out of the van they said *"one was not going to be arrested unless all of them were"*.

After the radio call for help, several highway patrol cars came. Those arrested were transported to Brandon, the county seat of Rankin County.

Douglas Bruce Huemmer, the driver of the van, testified that he had never had any encounter with Officer Baldwin prior to the arrest.

There had been eight marches in Mendenhall, all of them peaceful. None had been arrested during the march which preceded the automobile journey which culminated in the arrests.

The second van, accompanying the Huemmer van, was not halted.

██ The foregoing testimony is without dispute in the record and supports the finding that these individuals were not arrested because of their exercise of First Amendment, or other, Constitutional rights.

It would thus seem clear, beyond doubt, that these individuals were not entitled to remove their state misdemeanor prosecutions to the federal district court.

This leaves for consideration the situation of the three voluntary nocturnal jailhouse visitors who were not arrested on Highway 49 but who got into a fight at the jail and evidently came off with the worst of the encounter.

The occupants of the van which had not been stopped reported the stopping of the other vehicle to their associates. This resulted in the Reverend Brown, Reverend Perkins, and one Buckley going to the Rankin County jail, armed to the teeth. Huemmer testified that he, and these three men, were *then* beaten and kicked extensively by state and county officers, that his head and face were shaved, and that a white liquid that smelled like moonshine was poured over his head. He testified that he was verbally abused in jail by several officers who were drinking out of paper cups and who appeared to be drunk, but he was soon released on bail.

A deputy sheriff was called as an adverse witness by appellants. He said that on the night in question he was called to the sheriff's office. When he arrived there he observed the original arrestees being booked. He was there when Perkins, Brown, and Buckley arrived. There had been no difficulty prior to their arrival but a scuffle developed, limited to the room they were occupying. The deputy was then ordered by the sheriff to cut Huemmer's and Brown's hair, which he did. He testified that he didn't see any vermin in Huemmer's hair but that it was dirty, greasy, and that its removal revealed a scab over his scalp.

Another witness, Manorris, a student at Tougaloo College, one of the march directors in Mendenhall, was in jail when the Perkins trio came in. He was in another room, and could not observe what went on. He did say, nevertheless, that he saw Sheriff Edwards beating Perkins "until the sheriff's shirt tail came out". He also said he saw deputies strike one

David Nall. He saw no one strike an officer.

Nall, another Tougaloo student, testified he was struck in the van after he was ordered out of it at the jail. This was verified by none of the others present. He claimed that Sheriff Edwards used a blackjack on Perkins.

Brown, one of the trio which visited the jail after the alarm had been spread, testified that he is a Minister of the Voice of Calvary Bible Institute in Mendenhall. He came to Mississippi from California at the request of Perkins, and has been a leader in the boycott at Mendenhall from the beginning. He stated that when he, Perkins and Buckley went to the Rankin County jail in a red Volkswagen van, the vehicle contained a shotgun and two .22 rifles behind and over the front seat in plain view. He claimed that the reason for carrying the weapons was because of threats which had been made on his life. He further claimed that he and his companions were beaten at the jail for no provocation whatever. He was kept in jail until the next day, charged with disturbing the peace, carrying a concealed weapon, inciting to riot, and resisting arrest.

Perkins is a Minister in Mendenhall and was a leader of the boycott. He first learned of the arrest of Huemmer and the others from the driver of the second van. He then got in his Volkswagen and picked up Brown and Buckley. The three proceeded to the Brandon jail. Besides the weapons already mentioned Perkins admitted that he carried a pistol in the car, as the result, he said, of threats which had been made against him. Perkins contended that the three were arrested for no reason and were personally beaten without any preceding provocation.

Jonathan R. Edwards, the Sheriff of Rankin County, testified that he had already left his office for the day when he received a call to return. Shortly after he returned, the Highway Patrol arrived at the jail with the twenty original arrestees. He further testified that no violence started until after the arrival of Brown, Perkins, and Buckley, and until after Perkins aimed a blow at the sheriff, which missed. Then a general fracas broke out. There had been no drinking in the sheriff's office. Three guns, a pistol, and several pieces of brick tile were taken from the prisoners. Weapons taken from Huemmer's van included knives, two forks with the middle prongs turned down, and a pistol.

Edwards admitted that he knew a boycott had been in progress in Mendenhall. He also testified that after Huemmer's hair was cut he poured moonshine whiskey over his head.

■ No witness testified that Officer Baldwin followed the van from Mendenhall or that he knew when he stopped the van it contained individuals who had been participating in the boycott marches. His testimony that he made a routine traffic arrest is undisputed. Had there been a dispute, the Trial Judge had the responsibility of making the credibility choices, *not this Court*. The dissenting opinion attaches great weight to the testimony of several individuals who would depict the local officers as subhuman sadists, but this testimony was weighed and rejected by the trier of the fact—his function not ours.

The same rule applies to the altercations at the jail. Perkins, Brown, and Buckley were not lawyers, nor had they been sent for by any of those arrested. They simply chose to visit the jail, after regular visiting hours, armed with a shotgun, two rifles, and a pistol. If Perkins took a swing at the sheriff, as the sheriff swore he did, the credibility of which was for the decision of the District Court, then Perkins should have anticipated that this would meet with more than submissive disapproval. We do not condone the use of excessive force in the arrest and detention of prisoners. Neither do we approve the visitation of indignities upon prisoners. By the same token we are under no duty to extend some kind of left handed judicial approval to the practice of carrying an arsenal of weapons on night time visits to jails or

police stations, even if the possession of such weapons is otherwise lawful.

In any event, that is not the issue in this case. The question is whether the activities at the jail ousted the jurisdiction of the state courts to try these three men on misdemeanor charges and, at the same time, conferred jurisdiction on the federal courts to do so.

■■ We think not. Participating in a peaceable march in one county grants no immunity from the enforcement of the law in another county. Neither does such activity authorize persons to approach a local prison in the dark hours of the night, heavily armed. Carrying brick, broken tile, forks, and like weapons is not ordinarily consistent with peaceable activities.

It is important, in our view, that the disturbance at the jail was neither geographically nor periodically incidental to the marches in Mendenhall. In fact, so far as this record shows, no one in Simpson County knew what was going on in the adjoining county of Rankin.

■ Hence, we hold that the jail visitors were not entitled to have their cases removed to the federal courts. We simply hold that the findings of fact by the District Court are not clearly erroneous and that upon these findings the court committed no error in remanding the appellants to the state courts. If there is in fact no basis for the charges, that deficiency will be exposed by the evidence adduced and a directed verdict of acquittal will necessarily follow as a matter of law.

We, of course, decline to decide this case on the basis of acts committed by others, in other times, in other cases, under other circumstances. We are here required to apply the law to the facts as found by the District Court, governed by the clearly erroneous rule. We indulge in no attainders. There is evidence to support the finding that the original arrests were not prompted by the marches in Mendenhall. Most certainly, an armed visit to the jailhouse in the night time was not a part of the marches. It was purely a secondary episode.

These appellants are due to stand trial in the state courts.

Congress was careful to point this out in 18 U.S.C. § 245(a) (1):

"Nothing in this section shall be construed as indicating an intent on the part of Congress to prevent any State, any possession or Commonwealth of the United States, or the District of Columbia, from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section, nor shall anything in this section be construed as depriving State and local law enforcement authorities of responsibility for prosecuting acts that may be violations of this section and that are violations of State and local law * * *."

18 U.S.C. § 245 concluded:

"Nothing in this section shall be construed so as to deter any law enforcement officer from lawfully carrying out the duties of his office; and no law enforcement officer shall be considered to be in violation of this section for lawfully carrying out the duties of his office or lawfully enforcing ordinances and laws of the United States, [etc.]"

We conclude with this observation: Under Greenwood, Miss. v. Peacock, *supra,* these cases are not removable to the federal courts.

In this respect, Greenwood, Miss. v. Peacock was not affected by the enactment of 18 U.S.C. § 245. See People of State of New York v. Horelick, 2 Cir., 1970, 424 F.2d 697, cert. denied 398 U.S. 939, 90 S.Ct. 1839, 26 L.Ed.2d 273; Hill v. Commonwealth of Pennsylvania, 3 Cir., 1971, 439 F.2d 1016, cert. denied 404 U.S. 985, 92 S.Ct. 445, 30 L.Ed.2d 370.

The judgment of the District Court is Affirmed.

JOHN R. BROWN, Chief Judge (dissenting):

Viewed from any realistic perspective this case marks a critical stage in the

evolutionary development of Federal civil rights removal jurisdiction. Rev. Perkins is Mordecai at the Gate.[1] His allegations and proof demand that we let him in.

The complexities we face are not factual ones. We need not resolve credibility choices or conflicting inferences to determine what happened to these petitioners. No matter whose version is accepted the record is replete with uncontested evidence of patently frivolous arrests for nonexistent offenses, threatened and actual physical violence, and almost unbelievably humiliating and degrading treatment—including the indignity of shaving the prisoners' heads and pouring moonshine whiskey on one of them—that far surpasses the official brutality we have only recently condemned as cruel and unusual punishment violating the Eighth Amendment. Anderson v. Nosser, 5 Cir., 1971, 438 F.2d 183, pending rehearing *en banc*.

#### Prologue: The *Rachel-Peacock* Enigma

Actually our real problem here is to chart the unexplored outer limits of the removal remedy established by two closely related but factually dissimilar Supreme Court decisions, Georgia v. Rachel, 1966, 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed. 2d 925 and City of Greenwood, Miss. v. Peacock, 1966, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944. Simply stated, the question is whether removal relief is available when the petitioners have alleged and proven that their arrests and pending State criminal prosecutions, while temporally and geographically unrelated to antecedent protest activities protected by a specific Federal statute providing for equal civil rights in terms of race, were nevertheless initiated exclusively for the

purpose of discouraging those activities and intimidating the exercise of those rights. Few of our prior cases have dealt with precisely this situation.[2] Both *Rachel* and *Peacock* suggest possible alternative approaches, although neither provides an unequivocal solution under the circumstances now before us.

However, from the tenor of its opinion I assume the Court would agree with my position that these petitioners must prevail if, in addition to showing a causal connection between their Federally protected activities and their subsequent arrests and prosecutions, they have also established on this record that the State criminal proceedings have as their sole purpose the harassment and intimidation of conduct insulated by Federal law against illegitimate official interference. On this assumption our disagreement arises entirely over the degree of deference, if any, that must be accorded the District Court's finding on the issue of *why* these individuals are being prosecuted.

There is literally no evidence to support any of the charges against the 23 defendants.[3] Yet in determining whether the prosecutions constitute no more than racially motivated efforts to deprive them of equal civil rights the District Court limited itself exclusively to a determination that the defendants would receive a fair trial in the State courts and that the initial arrests were supported by probable cause,[4] while at the same time explicitly refusing to consider as relevant to the issue of prosecutorial purpose the undeniable fact that the charges are all groundless. The Court here has by implication sanctioned that procedurally defective approach.

I dissent because the findings of fact regarding the motivation for the prosecu-

---

1. See the Book of Esther, particularly ch. 4, vs. 1–2.

2. *But see* Judge Tuttle's opinion for the Court, and Judge Godbold's dissent, in Achtenberg v. Mississippi, 5 Cir., 1968, 393 F.2d 468.

3. The two appendixes at the end of this opinion contain a complete listing of all the charges and their sources. All but two of the defendants—Douglas Huemmer and Ira Phil Freshman—are black.

4. Under *Rachel* neither of these facts is relevant to the issue of removability. See notes 38 and 86, *infra*.

tions were hopelessly infected by the District Court's utilization of an erroneous legal standard ("fair trial" and "probable cause") in its assessment of the evidence. Since we are not compelled to adopt such findings (see note 93, *infra*), we should not hesitate to conclude on the basis of thoroughly developed and undisputed facts that the State criminal proceedings here are merely ill-disguised attempts to punish conduct protected under Federal law. As such they are classic targets for the civil rights removal remedy under the terms prescribed by *Rachel* and *Peacock*.

### The Geographical Locale

All of the Federally protected activities involved in this case took place in Mendenhall, Mississippi, a small town in Simpson County about 45 miles southeast of Jackson. On the other hand, all of the petitioners were arrested and charged several hours later in adjoining Rankin County, either on Highway 49 (the main highway between Mendenhall and Jackson) or at the jail in Brandon, the county seat. Thus the arrests and the exercise of the rights that allegedly provoked them were, in a strictly temporal or geographical sense, unrelated, and the charges on their face do not pertain to conduct protected under Federal law.

### The Mendenhall Demonstrations

In late 1969, two days before Christmas, the black residents of Mendenhall initiated a campaign designed to protest and ultimately to eradicate racial discrimination in the community. In addition to organizing an economic boycott of local white merchants they published a list of demands[5] enumerating the

5.      "DEMANDS OF THE BLACK COMMUNITY
Dec. 23, 1969
The selective buying campaign in Mendenhall, Simpson Co., was launched today, Dec. 23, 1969, primarily to secure employment in the business establishments in our town. We demand 30% of all employment in all business establishments as we are 30% of the buying population. We also urge and call for employment of Black citizens in city hall, court house. We call for police brutality to come to an end so that no more Roy Berry incidents will develop. We call for additional employment of Blacks on city police force. We call for Black deputy sheriffs at the court house. We call for Blacks on the school board. We call for complete school desegregation. We call upon reasonable men, Black and white, to help us in this move to bring justice and equality to Mendenhall and Simpson County.
WE DEMAND:
1. We demand 30% of all employment in all business establishments.
   a. We demand Black policemen on the police force
   b. We demand Black employees in the post office, FHA office, ASCS office, food stamp office, welfare office, bank, Sup't of Education office.
   c. We demand Black deputy sheriffs and Black jailers.
   d. We demand Black recorders in J. P. court

   e. We demand Black 30% of employees and ·voting-members of the local draft board
   f. We demand Black members on the school board
   g. We demand that all businesses with more than 3 employees have Black employees
2. No Black person shall be fired for not buying in Mendenhall.
3. We demand desegregated recreational facilities and Black full-time city-paid personnel be hired as supervisors.
4. We demand that all personnel, including maids, be paid the minimum wage including premium pay for over-time.
5. We demand the closing of all back-door cafes.
6. We demand that police brutality and murder of Black people be stopped. We demand an end to all police harassment, shakedown, beatings, threats, insults, abusive language, threats of violence, illegal searches and illegal arrests.
7. We demand that police must obey the U. S. Constitution and Supreme Court orders. Persons must be legally arrested, advised of his rights, rights to remain silent, rights to immediate bail, rights to phone call, attorney, clean and healthy containment.
8. Police, sheriffs, highway patrol must have sworn warrant for the arrest of any person, the search of any house or car.

grievances of the town's black population and calling among other things for the immediate and total integration of all public employment, the public schools, municipal recreational facilities and other places of public accommodation. To dramatize their protest they conducted a series of mass demonstrations and marches in Mendenhall beginning in late December 1969 and continuing into the first two months of 1970. On each occasion the demonstrators were under the close surveillance of numerous uniformed and plainclothes officers of the Mississippi Highway Patrol, who followed each march and took pictures of the participants with motion picture and still cameras.[6]

On February 7, 1970 two of the demonstration's organizers, Douglas B. Huemmer and Rev. John M. Perkins, drove to Tougaloo College near Jackson to pick up a group of black college students who sympathized with the objectives of the Mendenhall residents and who desired to participate in the marches scheduled for that day. Upon returning to Mendenhall they held a mass meeting at the local black cooperative store to discuss the boycott and to plan the route and timing of the march. When approximately 100 to 150 demonstrators subsequently paraded through the center of town carrying signs publicizing their demands, they encountered some minor hostility from bystanders, but there was no violence and no one was arrested. The marchers demonstrated for approximately 45 minutes, and as usual their activities were monitored by a substantial number of police officers, who set up a roadblock and drivers license check on Highway 13, the main road leading into the black section of town. Among the official observers was Jonathan Edwards III, the son of the sheriff of neighboring

9. We demand a court-appointed attorney be provided all persons arrested, from time of the arrest to the end of the trial.
10. We demand that police chief Sherman, officer Coleman, and officer R. T. Walker be fired and prohibited from holding any law enforcement position in the county.
11. We demand a complete remodeling of the jail and monthly inspections by the U. S. Dep't of Health.
12. We demand the establishment of a bi-racial Human Relations Committee to act as a police review board, to hear all complaints concerning police, sheriffs, and jailers. This committee will have power to make investigations and inspections of complaints, jail conditions, violations of rights, police misconduct, police headquarters; will have power to fire police, sheriffs, jailers and remove highway patrol officers from county beats.
13. We demand that all streets in the Black community be paved.
14. We demand that all charges be dropped against Rev. Perkins and Doug Huemmer and Roy Berry.
15. *We demand our freedom.* We demand the power to determine the destiny of our community. Black people will not be free until we are able to determine our own destiny.

*Selective buying will continue until employment situation is corrected.* Then, and only then, will the other items be negotiable. These can only be negotiated by the selected Black people chosen by the Black Community. No one person can negotiate these demands. *Final acceptance of a settlement lies with the Black Community.*"

6. Sam Ivy, the director of the Identification Bureau of the Highway Patrol, testified that he had dispatched at least two of his 15 agents to Mendenhall to cover the February protest activities, while Inspector Lloyd Jones, the officer in charge of the uniformed patrolmen of the Jackson Division, stated that at least six of his men were on duty at that time, including a specially trained photographer and an "electronics surveillance man." The officers employed a number of devices for identifying the leaders and participants in the marches, either by cross-checking with each other or by verifying vehicle registrations, and during the demonstrations they operated radar and VASCAR speed traps on the highway leading in and out of Mendenhall.

Inspector Ivy also testified that the Highway Patrol maintained a permanent file on investigations involving the Mendenhall civil rights movement. The District Court denied the petitioners' motion for production of it.

Rankin County, and Inspector Lloyd Jones of the Mississippi Highway Patrol.

## The Highway 49 Arrests

Following the march through town another meeting was held late in the afternoon at Rev. Perkins' church, after which 19 Tougaloo students boarded Huemmer's Dodge van for the trip back to the college. The route from Mendenhall to Jackson was U.S. Highway 49, a modern four-lane divided road with a maximum posted speed limit of 65 miles per hour. Huemmer, who was driving, testified that he proceeded north at a moderate rate of speed because he was being followed by the rest of the students in a Volkswagen and that he remained in the right-hand lane at all times except when passing two other vehicles. A passenger in the van testified that the group was followed from Simpson County (Mendenhall) by a Mississippi Highway Patrol car.

At approximately 6:30 p. m., immediately after crossing into Rankin County near the town of Plain, the van and its occupants were stopped by Highway Patrolman Douglas O. Baldwin, who had previously been assigned to cover one or two the Mendenhall marches and who was familiar with the civil rights activities going on there. Baldwin testified that

he had just come on duty following supper at his home in the nearby community of Florence and that he had followed the van for four or five miles before stopping it, allegedly because after weaving into the inside lane several times it had almost hit a passing car (whose color, make and description he could not recall).

After ordering Huemmer out of the van, Baldwin asked for his driver's license and directed him to sit in the patrol car. There, according to Huemmer, after discovering that the group had participated in the Mendenhall demonstration earlier that day, Baldwin made numerous threats that incorporated references to the protests in Simpson County [7] and then radioed a request for assistance.[8]

During the conversation between Baldwin and Huemmer two students got out of the van to stretch their legs but were ordered by the officer to get back into the vehicle.[9] They did. A few minutes later, in response to the radio request, between four and six Mississippi Highway Patrol cars arrived at the scene. With pistols drawn the patrolmen ordered all of the students to get out of the van, at which point they were all searched, arrested, handcuffed, and transported to the Rankin County jail at Brandon.[10] Huemmer, one of two white persons

7. " * * * He said, you almost hit a pickup, and I replied I don't know what you mean because I've been in that same lane for miles. Then he looked up and saw some of the Tougaloo students looking out of the rear windows of the truck at the car, he was about one car's length from the back of the truck, and then he asked me are you some of the demonstrators from Mendenhall and I said yeah and then he just sorta smiled and said, well, we're not going to take any more of this shit anymore and we're not going to take any more of this civil rights stuff, and I just didn't say anything and he picked up his microphone and called other units and said I've got a couple of niggers and whites, they are armed, come on down and help me clean them all out tonight, so with that there were a few responses on the radio so then I asked him if I was under arrest

or what was going on and he just didn't say anything else after that, and then he told me to shut up and if I didn't shut up he was going to shoot me in the head." (Tr. 212–13).
   The State did not attempt to impeach or refute this evidence with the testimony of Patrolman Baldwin. It is uncontradicted.

8. Baldwin admitted under oath that in making the call he might have said "I've got a truck load of niggers and there's a white with them." (Tr. 152).

9. David Nall, one of the students, testified that Patrolman Baldwin's words were, "You niggers get back in the van." (Tr. 261). Baldwin did not contradict this.

10. In his testimony Patrolman Baldwin never managed to satisfactorily account for the arrest of the 19 passengers:
   "Q Officer why did you arrest the people inside the van?

among the arrestees, testified that he was taken in a separate car and beaten en route and after arrival at the jail by Officer Frank Thames of the Highway Patrol.[11] Huemmer also stated that Thames had previously threatened his life because of his participation in civil rights activities in Simpson County.[12]

A  Well they wanted to go.

Q  Did every one of them indicate that they wanted you to place them under arrest?

A  Sir?

Q  Did every one of them come up to you and say, 'Officer, I would like to be arrested.' Is that a fact?

A  The statement was made that one person wasn't going unless all went.

Q  One person made that statement?

A  Yes.

Q  Nobody else made that statement?

A  I couldn't say.

Q  And on the basis of that statement, you arrested them all, is that right?

A  Yes, sir."

(Tr. 149–50.)

"BY THE COURT: What did you arrest all of them for?

BY THE WITNESS: For interfering with my duty.

BY THE COURT: How were they interfering with your duty?

BY THE WITNESS: They could have been jeopardizing my life.

BY THE COURT: Well what were they doing that you did arrest them for?

BY THE WITNESS: I arrested them for interfering with the duties of a law officer and concealed weapons."

(Tr. 112–13.)

11. "Q  Were you then taken to the Rankin County Jail Mr. Huemer?

A  Yes. After the students were handcuffed and taken off, I was pulled out of the car and handcuffed by Officer Thames, and one or two of the other officers were going to put me in another patrol car with some of the other students and Officer Thames said, no I want him for myself and went and put me in the back seat of Officer Baldwin's patrol car; then Officer Thames got in the passenger side of Officer Baldwin's car with Officer Baldwin driving the car and we left then for the jail, and I was still handcuffed, and then he turned around and said I told you last summer if you didn't get out of this civil rights stuff I was going to take care of you, and then he turned around and slapped me a few times in the face, and then he told me to turn around so he could take the handcuffs off. He took the handcuffs off of my right hand and it was still on my left hand and he pulled my hand down until my hand went down on the front seat and then he continued to slap or hit me and as we would pass another car or another truck on the highway he would stop, and then as we would go by the car or truck he would start again. Then he was hitting me in my face with his fist then he took the other handcuff off and stored it someplace and then he took me by my hair and twisted me so that my neck was kinda bent and punched me in my groin, my stomach and my face and my neck and then pushed me over toward Officer Baldwin who hit me a couple of times.

Q  Then what happened?

A  All during this he was saying he had warned me about civil rights stuff, that he didn't give a damn about civil rights stuff, that I was a damn cuban, and called me a god damn Moscow man, and all sorts of other profanity, and then when we got to the jail we stopped in an alley, it's an alley between the jail and the parking lot and I stayed in the back seat for about thirty or forty minutes and I could see from the window up in the jail where I guess they were processing other students, and during the time they kept me in the car out in the alley he would continue to come every two or three minutes and open the door and kick me or slap me and he kept worrying me with saying, I want to kill you tonight that's what I wanted, that he wasn't going to kill me but he was going to teach me a lesson and this lasted for about 30 minutes." (Tr. 215–17.)

Although Officer Thames was available to testify, the State did not call him. Huemmer's testimony is uncontradicted.

12. "Yes, last summer, I believe it was during the month of July, I was driving from Jackson to Mendenhall and Highway [Patrolman] Thames pulled me over and told me to get out of my car and lectured to me about, uh, he said he wasn't going to stand for me to do any civil rights work in Mendenhall, if I did anything he was going to harm me, in so many words, threatened to kill me, told me to get out of the state, said if I didn't, he was going to see to it that he was

The Volkswagen following the van was not stopped, and its occupants returned to Mendenhall and reported what had happened.

In its opinion the Court quotes testimony of Patrolman Baldwin to the effect that at the time he arrested the demonstrators he did not know they had participated in the Mendenhall marches. However, he immediately qualified that statement, as the transcript reveals:

"BY THE COURT: When you arrested these people did you know they were the Mendenhall marchers?

BY THE WITNESS: No sir.

BY THE COURT: You didn't know at the time?

BY THE WITNESS: Well *after I got them out of the truck I assumed they were,* yes sir, but I didn't know it at that time." (Tr. 126–27.) (Emphasis added.)

"Q. Now, when did you decide Officer Baldwin that you had stopped people associated with the boycott and marches and demonstrations in Mendenhall?

A: When all of them got out of the truck." (Tr. 141.)

But no one was actually arrested—certainly not for *resisting* arrest—until *after* the students got out of the van. Thus there is no dispute, by Baldwin's own admission, that before the defendants were arrested and taken into custody—that is, at a time when Baldwin could

have ticketed Huemmer and let him go on his way—the officer knew who his subjects were and what they had been doing in Mendenhall a few hours earlier.[13]

### The Rankin County Jail Arrests

After learning of the Highway 49 arrests the two black leaders of the Mendenhall civil rights movement, Rev. Perkins and Rev. Curry Brown, accompanied by a third man, Joe Paul Buckley, drove to the Rankin County jail with the intention of posting bond for those who had been arrested. Because of previous threats to his life Rev. Perkins carried with him in his car two rifles, one shotgun and a pistol, all of which were in plain view in the back seat and all of which were legally in his possession under Mississippi law. Arriving at the courthouse and jail in Brandon, the men were directed to a parking place by a highway partolman, after which they got out of the car and stood beside it talking for a few minutes. *The weapons remained inside the car at all times.* The three were then surrounded by approximately 12 law enforcement officers,[14] searched and arrested. Rev. Brown testified that he was kicked and beaten by Officer Thames while being taken into the jail.[15]

Of all the violent events that unfolded inside the jail that night, only one—the purported swing at the sheriff—is really sharply disputed. No one denies that

---

going to take care of me, and told me to get back in the car and leave, so I went back and went on to Mendenhall." (Tr. 197–98.)

This testimony was likewise not contradicted by Officer Thames or by anyone else.

13. The official radio log of the Mississippi Highway Patrol for February 7, 1970 contains an entry pertaining to a vehicle license check radioed to the scene of the arrests: "R/6152770 (panel truck) involved in demonstration." Baldwin testified that after Huemmer got out of the van he "assumed" he was with the Mendenhall demonstrators because "he was just the hippie type." (Tr. 142).

14. Among the arresting officers was Inspector Lloyd Jones of the Highway Patrol, who earlier in the day had participated in the surveillance activities at Mendenhall.

15. "Officer Thames took me up the driveway and as he was taking me and we started up the driveway he started kicking me in the back, he kicked me in the kidney and slapped me back of my head and I don't know if he was hitting me with his hand or hitting me with something but he did this all the way up to the jail door and then he shoved me inside * * *" (Tr. 283–84.)

Neither Thames nor anyone else contradicted this testimony.

there was a disturbance. While the petitioners all contend that they were attacked and beaten without provocation, the State's version is that Rev. Perkins' alleged attempt to strike the sheriff set off a spontaneous free-for-all that resulted in the use of what the District Court characterized as "rather violent force" against several of the prisoners. Despite the conflict on this point some relevant undisputed facts emerge from the record.

The only witness for the State [16] was the Rankin County Sheriff, Jonathan Edwards,[17] whose son appeared at the jail that night after participating in the surveillance activities at Mendenhall earlier in the day. Sheriff Edwards stated that he knew the prisoners were civil rights workers after they were brought in (Tr. 345), that he knew there was a boycott in progress in Mendenhall (Tr. 349), and that prior to the disturbance in the jail no one had caused any trouble or resisted arrest (Tr. 341). By his count there were at least five deputy sheriffs and between seven and twelve highway patrolmen in the jail at the time the fight broke out. The sheriff testified that Rev. Perkins swung at him for no apparent reason and that he responded by hitting him two or three times with his fist. For some unexplained reason neither Rev. Perkins nor any of the other prisoners were charged with assaulting the sheriff or any other officer.

Rev. Perkins' account of the affair is somewhat different. He testified that after he was brought into the jail several officers, including the sheriff, proceeded without provocation to beat him into insensibility.[18] His version was con-

16. Six of the petitioners testified, along with four State officials called as adverse witnesses. Deputy A. B. Martin, who was present during the disturbance and who filed the charges against Rev. Perkins, Rev. Brown and Buckley (see App. B), was not called by the State.

17. This is the Court's second encounter with this individual. The first was United States v. Edwards, 5 Cir., 1964, 333 F.2d 575, in which the Department of Justice sought an injunction under the Civil Rights Act of 1957 to restrain his interference with the Federally protected right to vote after he beat up a black citizen waiting to register in the Rankin County courthouse. Affirming the District Court's denial of injunctive relief on the theory that the defendant had not engaged in a continuing and systematic course of intimidation, the Court referred to the incident as an "isolated occurrence" and accepted the finding that "there was no reasonable justification to believe that such an incident would ever occur again." 333 F.2d at 577.

As a dissenting member of that panel my conclusion then was that the affair was "no case of isolated momentary violence." 333 F.2d at 581. Implicit was my conviction that such flagrantly lawless conduct would be repeated and that injunctive relief was imperative. Now, more than seven years later, this record —even when read most favorably to the sheriff—bears out my prediction.

18. " * * * when I got to the jail and saw the people in the jail, of course I was horrified as to why we were arrested and when I got in the jail Sheriff Jonathan Edwards came over to me right away and said, this is the smart nigger, and this is a new ballgame, *you're not in Simpson County now, you are in Brandon*, and we began, and uh, he began to beat me, and from that time on they continued beating me, I was beat to the floor and just punched and just really beaten."
(Tr. 304–05.) (Emphasis added.)
" * * * they came back over there and beat me to the floor and stomped me, and then they took me to the fat well and it seemed to me that there was some sounds coming in over the radio that the F.B.I. or someone was coming, so they made me get the mop and blood was coming all out of my head and they made me get the mop and mop the floor and they would hit me and kick me as I mopped up the floor and then I got the floor mopped and the officers put me back in a room and they had me to wash my head and wash my face and clean myself up and when they found out the F.B.I. wasn't coming they started beating me up again, and cursing at me and then they took me in the fingerprint room and started taking my fingerprints * * * and then they started torturing us, it was horrifying, I couldn't even imagine that this was happening, one of the officers took

firmed by Rev. Brown, who stated that the sheriff made several references to the prisoners' civil rights activities in Mendenhall before and during the assault.[19] The same story was repeated by Douglas Huemmer[20] and by Manorris Odom, one of the students, who testified that the sheriff "beat [Rev. Perkins] so viciously his shirt came out." (Tr. 243).

Sheriff Edwards testified that afterward he ordered Rev. Perkins to mop up the blood on the floor (Tr. 357).

The sheriff also admitted that following the disturbance his deputies proceeded to shave the heads of Rev. Brown and Huemmer[21] and that he personally poured moonshine whiskey on Huemmer's head (Tr. 359). There was no

a fork that was bent down and he brought that fork up to me and he said, have you seen this, and he took that fork and put that fork into my nose, then he took that fork and pushed it down in my throat and then they took me over there and beat me to the ground, and Officer Thames, he was doing most of the talking, and then they beat me to the floor and Mr. Lloyd Jones was sitting down on the front desk and he got up and he stomped me and by this time I was almost out." (Tr. 307–08.)

19. "* * * I heard Sheriff Edwards say to Reverend Perkins, this is Brandon and not Mendenhall, and then he walked over and started hitting him and then he said to one of the students leaning against the counter he said nigger get off of that counter and somebody hauled off and smacked him with a billy club and they beat Reverend Perkins to the floor and he couldn't get up and he kept telling him to get up and Officer Thames said, I'll get him up and he walked over there and started kicking him, and then the officer who had fingerprinted me in Mendenhall he came out he had on the same suit and he came out and said, I wanted to whip that nigger when I was in Mendenhall and he walked over and started beating me with his stick." (Tr. 284–85.)

"Well then he beat me for a while and he walked off and then Officer Thames came back and he had a flashlight in his hands and he hauled off and hit me with it and I had my hands up like this and he hit my hands and his flashlight flew out of his hands and broke and then he really got mad and then he hit me three or four more times and said, I'm not through with you yet." (Tr. 285–86.)

"Then they brought Reverend Perkins in while I was standing against the wall, and then all of the policemen got around him and told him to read the demands, I don't know where they had got a copy of them from, I guess in Mendenhall, and he began to read them and they would say, nigger read louder, and one of the policemen said, I can't stand a nigger that can't read loud. Then he started reading them, and then they saw me standing against the wall and one of them said, get that nigger out of here, and they started talking me out and when I started out of the door somebody hit me from the back on my head, and then they kicked me and knocked me against the door and then they beat me out of there, and they got me around and up the stairs and when they got me to the iron door it wasn't open, they beat me there and kicked me into the cell." (Tr. 288.)

20. "* * * Sheriff Edwards and Sheriff Edwards' son and two Highway Patrolmen that I don't know the names of and Officer Thames had a leather blackjack thing and they began beating on Reverend Brown, Reverend Perkins, David Nall and myself and one of the other students, and they beat Reverend Brown down to the floor and then Reverend Perkins was dragged over on the other side and beaten down by about five other officers, I could hear him being beaten and then I was knocked out and when I came to I heard them ordering Reverend Perkins to mop up the blood that was on the floor. By this time David Nall was bleeding all over the floor and Reverend Perkins was lying sorta stunned on the floor and they kicked him until he got up * * * then Sheriff Edwards, Sheriff Edwards' son, and two or three patrol officers would walk by every two or three minutes and kick or hit Reverend Perkins with one of their blackjacks or their feet." (Tr. 218–19.)

21. Huemmer testified that the deputies justified this procedure by saying "they didn't want me to look like a nigger." (Tr. 223.)

evidence to establish where the whiskey came from nor what it was doing in the jail at that time of night, although the sheriff did strenuously deny that any of his men had been drinking or were drunk during the hours in question. The prisoners, however, testified that several deputies were drinking a clear liquid in paper cups, that it smelled like alcohol and that they appeared to be intoxicated. While there is no evidence whatever suggesting that any of the officers suffered even minor injuries as a result of the incident, the photographic evidence introduced by the petitioners graphically illustrates the treatment that was accorded them.[22] The testimony regarding the purpose behind the brutality was clear and uncontradicted.[23]

Five days after the arrests all 23 defendants sought to remove their pending State criminal prosecutions to the District Court pursuant to the civil rights removal statute,[24] alleging in their verified removal petition deprivations of rights guaranteed under Federal law by 18 U.S.C.A. § 245(b),[25] specifically the

22. Included in the exhibits are photographs showing two deep lacerations in the back of Rev. Brown's head, numerous bruises on Rev. Perkins' torso, and the mouth of one of the students whose teeth were knocked out. Rev. Brown testified that some of the students used their shirts, soaked in cold water, to stop the bleeding. He was finally released from jail on Monday, after posting the $5000 bond demanded by the sheriff.

Sheriff Edwards denied under oath that he struck any of the prisoners with a blackjack. The District Court sustained the State's objection to an attempt to impeach this testimony by introducing the deposition of the sheriff's son, who stated that Edwards struck Rev. Perkins at least twice with a blackjack (Tr. 353–54). The testimony of Huemmer (Tr. 222) and David Nall (Tr. 269) confirmed this account.

Ironically, a similar disclaimer by the sheriff in connection with the identical issue in the 1964 injunction action led the same District Judge to conclude that Edwards had perjured himself. "Rejecting the Sheriff's denial that he used anything but his hands, [Judge Cox] found that the 'Sheriff struck Grim * * * with a blackjack.'" United States v. Edwards, note 17, *supra*, 333 F.2d at 580 (dissenting opinion).

23. Huemmer's testimony leaves little doubt as to motive:
"* * * They kept repeatedly saying to me that this is going to teach you a lesson and teach those people a lesson about civil rights, the highway patrol officers kept saying we're not going to stand for that civil rights stuff in Mississippi.
BY THE COURT: What officers were saying that?
BY THE WITNESS: Officer Baldwin, Officer Thames, the Sheriff of Rankin County and his son. In fact when I was first led into the jail, and when Perkins and Brown were led in, the first thing that the Sheriff said was this is a whole new ballgame, this ain't Simpson County, this is Rankin County and I'm in control here and then went down with his blackjack and started beating on Reverend Perkins."
(Tr. 221–22.)
Earlier that day in Mendenhall, after being assaulted by a local store owner, Rev. Brown was arrested on a charge of disorderly conduct. He testified that the officer who fingerprinted him there was present at the Rankin County jail. "He came out he had on the same suit and he came out and said, I wanted to whip that nigger when I was in Mendenhall and he walked over and started beating me with his stick."
(Tr. 284–85.)

24. "Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:
(1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof."
28 U.S.C.A. § 1443(1).

25. "§ 245. *Federally protected activities.*
* * * * *
(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—
(1) any person because he is or has been, or in order to intimidate such

rights provided in § 245(b) (5) to "lawfully [aid] or [encourage] other persons to participate, *without discrimination on account of race [or] color * * * * in any of the benefits or activities described"* in that section and to participate "lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate." (Emphasis added.) Following the requisite evidentiary hearing [26] the District Court entered an order remanding the prosecutions to the State courts of Mississippi after holding that there was probable cause for all the arrests, that the petitioners would receive a fair trial, and that there was therefore no "federal right which is being violated by a prosecution of these charges against [petitioners] in the state court, *whether groundless or not."* (Emphasis added.) This Court stayed the remand order pending appeal.

---

person or any other person or any class of persons from—

\* \* \* \* \*

(C) applying for or enjoying employment, or any perquisite thereof, by any agency of the United States; [or]

\* \* \* \* \*

(2) any person because of his race [or] color * * * and because he is or has been—(A) enrolling in or attending any public school or public college;

(B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;

(C) applying for or enjoying employment, or any perquisite thereof, by any private employer or any agency of any State or subdivision thereof, or joining or using the services or advantages of any labor organization, hiring hall, or employment agency;

\* \* \* \* \*

(F) enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment which provides lodging to transient guests, or of any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises, or of any gasoline station, or of any motion picture house, theater, concert hall, sports arena, stadium, or any other place of exhibition or entertainment which serves the public, or of any other establishment which serves the public and (i) which is located within the premises of any of the aforesaid establishments or within the premises of which is physically located any of the aforesaid establishments, and (ii) which holds itself out as serving patrons of such establishments; or

\* \* \* \* \*

(4) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

(A) participating, without discrimination on account of race [or] color, * * * in any of the benefits or activities described in subparagraphs (1) (A) through (1) (E) or subparagraphs (2) (A) through (2) (F); or

(B) affording another person or class of persons opportunity or protection to so participate; or

(5) any citizen because he is or has been, or in order to intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race [or] color * * * in any of the benefits or activities described in subparagraphs (1) (A) through (1) (E) or subparagraphs (2) (A) through (2) (F), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate—

shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life."

26. Hartfield v. Mississippi, 5 Cir., 1966, 367 F.2d 362; Kaslo v. City of Meridian, 5 Cir., 1966, 360 F.2d 282; Smith v. City of Jackson, 5 Cir., 1966, 358 F.2d 705; Cooper v. Alabama, 5 Cir., 1965, 353 F.2d 729.

The District Court declined to consolidate the removal action with another proceeding in which the same petitioners sought Federal injunctive relief against their prosecutions.

## The Law

Unlike several of the cases [27] in which we have rejected attempts to remove pending State criminal prosecutions to Federal courts, the present effort to invoke § 1443(1) jurisdiction cannot realistically be characterized as frivolous. Quite obviously its aim is to vindicate the specific Federal statutory civil right to protest racial segregation following an attempt by State law enforcement officers to discourage or suppress the exercise of that right through the initiation of groundless criminal prosecutions based upon wholly fictitious offenses. Its novelty lies in the assertion, seldom squarely considered before in this Circuit,[28] that the civil rights removal remedy may be invoked against racially discriminatory State criminal prosecutions regardless of where or when the arrests (or the allegedly criminal conduct ostensibly motivating them) take place—that is, regardless of whether the defendants are actually exercising or attempting to exercise their equal civil rights at the moment of their arrests. On this theory mere temporal or geographical remoteness is irrelevant (except in an evidentiary sense). The critical factor is whether the sole purpose of the State criminal proceedings is to discourage or punish activity protected by a law providing for equal civil rights in racial terms.[29]

Novelty is no barrier under the present circumstances, however. The thrust of *Rachel, Peacock* and our own prior decisions clearly establishes that the petitioners' allegations meet the requirements for removal relief. The undisputed evidence in the record shows that beyond doubt they are entitled to it.

Within the present context both *Rachel* and *Peacock* stand for no more than the now acknowledged proposition that Federal civil rights removal jurisdiction cannot be predicated on a bare assertion that the State prosecutions are illegal, or that the charges are racially motivated or unsupported by the evidence, or that the proceedings infringe on the exercise or enjoyment of asserted *constitutional* rights.[30] See Sinclair v. State

27. E. g., Griffin v. Mississippi, 5 Cir., 1970, 435 F.2d 168; Boring v. Mississippi, 5 Cir., 1970, 431 F.2d 484; Miller v. Wade, 5 Cir., 1969, 420 F.2d 489, cert. denied, 1970, 397 U.S. 1068, 90 S.Ct. 1509, 25 L.Ed.2d 609; Louisiana v. Rouselle, 5 Cir., 1969, 418 F.2d 873; Shuttlesworth v. City of Birmingham, 5 Cir., 1968, 399 F.2d 529; Archie v. Mississippi, 5 Cir., 1966, 362 F.2d 1012. In none of these instances did the petitioners allege or prove that the conduct triggering their arrests and prosecutions was protected by a law providing for equal rights in terms of race, or that the prosecutions were initiated exclusively for the purpose of punishing, harassing, intimidating or interfering with the exercise of such rights.

28. *But see* Achtenberg v. Mississippi, *infra;* see also Griffin v. Louisiana, E.D. La., 1967, 269 F.Supp. 32, vacated and remanded, 5 Cir., 1968, 395 F.2d 991; Heymann v. Louisiana, E.D.La., 1967, 269 F.Supp. 36. The problem involved here was by implication resolved in favor of removal in Whatley v. City of Vidalia and Davis v. Alabama, *infra.*

29. The "protective law" in this case is the Civil Rights Act of 1968. "In effect the Act prohibits the application of state laws in a way that would deprive any person of the rights granted under the Act." Hamm v. City of Rock Hill, 1964, 379 U.S. 306, 311, 85 S.Ct. 384, 389, 13 L.Ed. 2d 300, 305.

30. " * * * It is *not* enough to support removal under § 1443(1) to allege or show that the defendant's federal equal civil rights have been illegally and corruptly denied by state administrative officials in advance of trial, that the charges against the defendant are false, or that the defendant is unable to obtain a fair trial in a particular state court. The motives of the officers bringing the charges may be corrupt, but that does not show that the state trial court will find the defendant guilty if he is innocent, or that in any other manner the defendant will be 'denied or cannot enforce in the courts' of the State any right under a federal law providing for equal civil rights." City of Greenwood, Miss. v. Peacock, 384 U.S. at 827–828, 86 S.Ct. at 1812, 16 L.Ed.2d at 956–957.

of Louisiana, 5 Cir., 1967, 384 F.2d 310; Bass v. Mississippi, 5 Cir., 1967, 381 F. 2d 692, 697; Student Non-Violent Coordinating Committee v. Smith, 5 Cir., 1967, 382 F.2d 9, 11, and cases cited in note 27, *supra.* Something more is required—specifically, allegations and proof that the arrest and prosecutions have been initiated not for the legitimate purpose of enforcing an otherwise valid State law but *solely* in order to deny to the defendant the benefits of a law "providing for specific civil rights stated in terms of racial equality." Georgia v. Rachel, 384 U.S. at 792, 86 S.Ct. at 1790, 16 L.Ed.2d at 933.

### The *Rachel-Peacock* Distinction

Regardless of the superficial ease with which the two cases may be distinguished in the abstract, however, the problems involved in correctly applying the principles announced in *Rachel* and *Peacock* to the present facts are considerable. The difficulty arises primarily from two radically divergent interpretations that may reasonably be given some of the language in both decisions, with diametrically opposite results. Before analyzing the accretion of case law that encrusts them, we might best begin with a determination of what they do— and do not—decide.

Because orders remanding cases removed to the District Courts were not subject to appellate review between 1887 and 1964, *Rachel* and *Peacock* were the first civil rights removal cases to reach the Supreme Court in sixty years. In each of them the broad question presented for decision involved the scope and application of the language in § 1443(1) providing for removal to the District Courts of State criminal prosecutions in which the defendant "is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States." [31]

At least two possible alternative interpretations of this provision were available. The first, drawing support from suggestions to that effect in a series of nine cases beginning with Strauder v. West Virginia, 1880, 100 U.S. 303, 25 L.Ed. 664 and Virginia v. Rives, 1880, 100 U.S. 313, 25 L.Ed. 667 and ending with Kentucky v. Powers, 1906, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633, would have limited its application exclusively to situations in which the defendant is denied equal civil rights because of an unconstitutional State statute.[32] The second, relying primarily upon the contemporary expansion of the constitutional principle of equal protection of the law, would have permitted removal of *any* prosecution in which the defendant could establish that his trial in a State court would deprive him of an "equal" right under any law—

---

31. The Court also considered but rejected arguments that § 1443(2) authorized removal, concluding that "the history of § 1443(2) demonstrates convincingly that this subsection of the removal statute is available only to federal officers and to persons assisting such officers in the performance of their official duties." City of Greenwood, Miss. v. Peacock, 384 U.S. at 815, 86 S.Ct. at 1805, 16 L.Ed.2d at 949. For all practical purposes § 1443(2) is now a dead letter.

32. "It is evident, therefore, that the denial or inability to enforce in the judicial tribunals of a State, rights secured to a defendant by any law providing for the equal civil rights of all persons citizens of the United States, of which [the removal statute] speaks, is primarily, if not exclusively, a denial of such rights, or an inability to enforce them, resulting from the Constitutional or laws of the State, rather than a denial first made manifest at the trial of the case. In other words, the statute has reference to a legislative denial or an inability resulting from it." Virginia v. Rives, 100 U.S. at 319–320, 25 L.Ed. at 670. See also Neal v. Delaware, 1881, 103 U.S. 370, 26 L.Ed. 567; Bush v. Kentucky, 1883, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354; Gibson v. Mississippi, 1896, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075; Smith v. Mississippi, 1896, 162 U.S. 592, 16 S. Ct. 900, 40 L.Ed. 1082; Murray v. Louisiana, 1896, 163 U.S. 101, 16 S.Ct. 990, 41 L.Ed. 87; Williams v. Mississippi, 1898, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012.

including, of course, the Fourteenth Amendment. Disclaiming either of these extremes the Supreme Court, like Aristotle, adopted a middle course.

### Rachel

In *Rachel* the Court held that the allegations of the removal petition, if established, were sufficient to invoke the exercise of Federal civil rights removal jurisdiction. There the defendants in 20 pending criminal trespass prosecutions sought to remove the proceedings from the State courts of Georgia after they were arrested in 1963 while peacefully seeking service in privately owned restaurants. Many of such establishments were eventually subject to the public accommodations provisions of the Civil Rights Act of 1964.[33] In their removal petition they alleged that they were arrested *exclusively* because of their attempts to obtain nondiscriminatory service [34] and that as a result of their prosecutions they were denied or could not enforce the State courts rights under laws providing for equal civil rights of citizens of the United States.[35]

The opinion of the Court deals with two sharply distinguishable issues. The first is the meaning in § 1443(1) of the phrase "any law providing for the equal civil rights." Rejecting an expansive interpretation of that language on the basis of available historical data, the Court concluded that it "must be construed to mean any law providing for specific civil rights stated in terms of racial equality," rather than broad constitutional guarantees "phrased in terms of general application available to all persons or citizens." 384 U.S. at 792, 86 S.Ct. at 1790, 16 L.Ed.2d at 933–934. The Court therefore disclaimed a removal theory grounded on an asserted denial of First and Fourteenth Amendment rights.

In the second portion of its opinion, however, the Court likewise declined to adopt the entrenched *Strauder-Rives-Powers* doctrine insofar as it suggested that the removal remedy was available only if the defendant could establish that his prosecution deprived him of equal civil rights by virtue of the operation of an unconstitutional State law. Instead, after analyzing the legislative history of § 1443 and the purposes it was designed to effect, the Court determined that "removal might be justified, even in the absence of a discriminatory state enactment, if an equivalent basis [can] be shown for an equally firm prediction that the defendant [will] be 'denied or cannot enforce' the specified federal rights in the state court." 384 U.S. at 804, 86 S.Ct. at 1796, 16 L.Ed.2d at 940.

The "firm basis" for the "clear prediction" was provided by the allegations of the removal petition in *Rachel* because of the previous decision in Hamm v. City of Rock Hill, 1964, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300. There the Supreme

---

33. Title II of the Act, § 201(a), provides a right to "the full and equal enjoyment * * * of any place of public accommodation * * * without discrimination or segregation on the ground of race * * *."

42 U.S.C.A. § 2000a.

34. As the Court explicity pointed out, "the defendants alleged: 'their arrests were effected *for the sole purpose* of aiding, abetting, and perpetuating * * * [the custom of] serving and seating members of the Negro race in such places of public accommodation and convenience upon a racially discriminatory basis and upon terms and conditions not imposed upon members of the so-called white or Caucasian race.'" 384 U.S. at 783, 86 S.Ct.

at 1785, 16 L.Ed.2d at 928.
(Emphasis added.)

35. The petition alleged deprivations of rights under the First and Fourteenth Amendments because the Civil Rights Act of 1964 had not been enacted until after the removal proceedings had been initiated. "Since the petition predated the enactment of the Public Accommodations Title of the Civil Rights Act of 1964, it could not have explicitly alleged coverage under that Act. It recites facts, however, that invoke application of that Act on appeal." 384 U.S. at 793, n. 21, 86 S.Ct. at 1790–1791, 16 L.Ed.2d at 934. A removal petition is required to contain only "a short and plain statement of the facts" which entitle the defendant to relief. 28 U.S.C.A. § 1446(a).

Court held that the 1964 Civil Rights Act's interdiction in § 203(c) of "attempts to punish" [36] peaceful efforts to obtain nondiscriminatory service in places of public accommodation meant, by implication, attempts to *prosecute* them as well.[37] Thus, if the petitioners in *Rachel* had been asked only because of their race to leave the restaurants, and as a result of their refusal had been arrested and prosecuted exclusively for conduct immunized against prosecution by Federal law, "then the mere pendency of the prosecutions enables the federal court to make the clear prediction that the defendants will be 'denied or cannot enforce in the courts of [the] State' the right to be free of any 'attempt to punish' them for protected activity." 384 U.S. at 805, 86 S.Ct. at 1797, 16 L.Ed. 2d at 941.

The Court then went on to make crystal clear that if the allegations in the removal petition were proven the mere possibility, the substantial probability, or even the absolute certainty that the defendants would ultimately be acquitted in their State trials was of no relevance whatever.[38]

### Peacock

In *Peacock* the Supreme Court considered two removal petitions and found both of them insufficient. The *reasons* for their inadequacy have, for more than five years, remained "the enigma wrapped in a mystery [and] enshrouded in fog." [39]

The first petition involved the case of 14 people charged with obstructing the public streets of Greenwood, Mississippi. It alleged that the petitioners were members of a group engaged in voter registration activities in Leflore County, that the statute under which they were charged was unconstitutionally vague on its face, and that its application to them was part of a policy designed to perpetuate racial segregation in the city and State. It also alleged that as a result of their prosecutions the defendants were denied or could not enforce their equal constitutional [40] and statutory [41] civil rights in State courts.

36. "No person shall * * * (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by [this Act]." 42 U.S.C.A. § 2000a–2. See note 33, *supra*.

37. "On its face, this language prohibits prosecution of any person for seeking service in a covered establishment, because of his race or color."
Hamm v. City of Rock Hill, 379 U.S. at 311, 85 S.Ct. at 389, 13 L.Ed.2d at 304. See also note 29, *supra*.

38. "It is no answer in these circumstances that the defendants might eventually prevail in the state court. The burden of having to defend the prosecutions is itself the denial of a right explicitly conferred by the Civil Rights Act of 1964 * * * for the denial in the courts of the State * * * clearly appears without any detailed analysis of the likely behavior of any particular state court."
384 U.S. at 805, 86 S.Ct. at 1797, 16 L.Ed.2d at 941.
In this Court Judge Bell had contended in a dissenting opinion that considerations of comity and regard for the principles of Federalism dictated the assumption

that the State courts would comply with the decision in *Hamm* and acquit the defendants. Rachel v. Georgia, 5 Cir., 1965, 342 F.2d 336, 343–345.

39. Emerson Electric Co. v. Farmer, 5 Cir., 1970, 427 F.2d 1082, 1086.

40. Specifically, the rights to freedom of speech, petition and assembly under the First and Fourteenth Amendments and the rights guaranteed by the equal protection, due process and privileges and immunities clauses of the Fourteenth Amendment.

41. Specifically, the right to vote without regard to race guaranteed by 42 U.S.C.A. § 1971(a) (1). Section 1971(b) provides that "no person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose."
It is at this point that the *Peacock* enigma begins to take shape, for in the same footnote in which the Court quotes § 1971(a) (1) and § 1971(b), it also quotes, *without further elaboration*, § 11 (b) of the Voting Rights Act of 1965, 42

The second petition arose from the arrest of 15 people charged with a variety of criminal offenses, including inciting to riot, parading without a permit and assault and battery by biting a policeman.[42] "These defendants filed essentially identical petitions for removal in the District Court, denying that they had engaged in any conduct prohibited by valid laws and stating that their arrests and prosecutions were for the 'sole purpose and effect of harassing Petitioners and of punishing them for and deterring them from the exercise of their constitutionally protected right to protest the conditions of racial discrimination and segregation' in Mississippi." 384 U.S. at 813, 86 S.Ct. at 1804–1805, 16 L.Ed.2d at 948.[43]

The Supreme Court held that "to sustain removal of these prosecutions to a federal court *upon the allegations of the petitions in this case* would therefore mark a complete departure from the terms of the removal statute * * *." 384 U.S. at 827, 86 S.Ct. at 1812, 16 L. Ed.2d at 956 (emphasis added). This sentence is the key that unlocks the door.

Unlike the *Rachel* petition,[44] the *Peacock* petitions contain no allegation, or statements from which such an allegation might be inferred, that the defendants were arrested and charged *exclusively* because of their participation in an activity immunized by Federal law against State criminal prosecution.[45] In other words, while both *Peacock* petitions (broadly construed) assert that the defendants' "federal equal civil rights have been illegally and corruptly denied by state administrative officials in advance of trial," 384 U.S. at 827, 86 S.Ct. at 1812, 16 L.Ed.2d at 956–957, neither of them (unlike the *Rachel* petition) by implicit or explicit allegations refutes the inference that the arrests and prosecutions were *also* initiated for the concededly legitimate purpose of enforcing otherwise valid criminal laws that neither the defendants nor anyone else had a Federal right to violate. Absent such allegations a removal petition is not sufficient to invoke the jurisdiction of the District Court under the terms prescribed by *Rachel*.

---

U.S.C.A. § 1973i(b), which prohibits not merely actual or attempted interference with the right to vote but also similar interference with "any person for urging or aiding any person to vote or attempt to vote." 384 U.S. at 811, n. 3, 86 S.Ct. at 1803–1804, 16 L.Ed.2d at 948. As in *Rachel* the statute was enacted subsequent to the filing of the removal petition in the District Court.

42. The case came to this Court as Weathers v. City of Greenwood, 5 Cir., 1965, 347 F.2d 986.

43. In addition to invoking § 1443(1) the petitioners also relied on § 1443(2). Their argument on the second ground was rejected. See note 31, *supra*.

44. See notes 34 and 35, *supra*.

45. Throughout both opinions the Court repeatedly emphasizes that in *Rachel* the petitioners alleged that the *exclusive purpose* of their prosecutions was to punish *only that conduct* protected by Federal law against "puishment." "In State of Georgia v. Rachel * * * we have held that removal of a state court trespass prosecution can be had under § 1443(1)

upon a petition alleging that the prosecution *stems exclusively* from the petitioners' [exercise of a Federally protected equal civil right]. * * * The present case, however, is far different." City of Greenwood, Miss. v. Peacock, 384 U.S. at 824–825, 86 S.Ct. at 1811, 16 L.Ed.2d at 955 (emphasis added).

In *Rachel* the Court does not once refer to the petitioners' allegations regarding the motives for the prosecution without employing such terms as "exclusively" and "solely." "The removal petition may fairly be read to allege that the defendants will be brought to trial *solely* as the result of peaceful attempts to obtain service at places of public accommodation." 384 U.S. at 793, 86 S.Ct. at 1790, 16 L.Ed.2d at 934 (emphasis added). Following remand the petitioners were to be given the "opportunity to establish that they were ordered to leave the restaurant facilities *solely* for racial reasons." 384 U.S. at 805, 86 S.Ct. at 1797, 16 L.Ed. 2d at 941 (emphasis added). "If service was denied for other reasons, no case for removal has been made out." 384 U.S. at 807, 86 S.Ct. at 1800, 16 L.Ed.2d at 943 (concurring opinion).

This interpretation of the opinion is reinforced by the Supreme Court's own characterization of the petitions in *Peacock*. "The fundamental claim in this case, then, is that a case for removal is made under § 1443(1) upon a petition alleging: (1) that the defendants were arrested by state officers and charged with various offenses under state law because they were Negroes or because they were engaged in helping Negroes assert their rights under federal equal civil rights laws, and that they are completely innocent of the charges against them, or (2) that the defendants will be unable to obtain a fair trial in the state court. *The basic difference between this case and Rachel is thus immediately apparent*." 384 U.S. at 826, 86 S.Ct. at 1811, 16 L.Ed.2d at 955–956 (emphasis added).

The "basic difference," as the Court then goes on to point out, is that (i) the petitioners did not allege, either by invoking an explicit Federal statute or by asserting facts to that effect, that they were being prosecuted *exclusively* because of their previous exercise of Federal equal civil rights,[46] and (ii) they did not allege that the conduct for which they were being prosecuted was immunized against prosecution by the terms of a specific statute providing for equal civil rights in terms of race.[47] Of course, the petitioners in *Rachel* did.

### *Rachel* and *Peacock* Distinguished

*Peacock* does not by implication overrule *Rachel*. It does not limit the application of the reasoning in *Rachel* to racially discriminatory denials of restaurant service in violation of the 1964 Civil Rights Act. What *Peacock* does hold, like *Rachel*, is that before a Federal Judge is asked to undertake the extraordinarily serious step of halting pending State criminal prosecutions he must be presented with the basis for a "clear prediction" that the defendant's Federally protected rights will be denied by the very act of bringing him to trial in a State court.[48] Initially the only possi-

46. "* * * no federal law confers an absolute right on private citizens—on civil rights advocates, on Negroes, or on anybody else—to, obstruct a public street, to contribute to the delinquency of a minor, to drive an automobile without a license, or to bite a policeman."
384 U.S. at 826–827, 86 S.Ct. at 1812, 16 L.Ed.2d at 956.
This sentence had led many interpreters of *Peacock* to conclude that the Supreme Court, despite the painstaking elaboration of removal criteria in *Rachel*, intended to limit the removal remedy exclusively to prosecutions in which the conduct *charged as a criminal offense* is protected by a Federal equal civil rights law (see discussion of the "scope of conduct" theory, *infra*). It plainly did not.
While none of the petitioners in *Peacock* had an "absolute right" to bite a policeman, it is equally true that "no federal law [conferred] an absolute right" on Thomas Rachel to commit the offense of criminal trespass by refusing to leave the premises of a private restaurant when requested to do so. See note 45, *supra*. He *did* have an absolute right to refuse peacefully to acquiesce in a racially discriminatory exclusion and to be free of State criminal prosecution resulting *only*

from that refusal. But the nature of that right depends upon the reason for the prosecution, not simply upon the character of the conduct charged to be criminal. *Rachel's* allegations still would have been sufficient if, absent a criminal trespass statute, the police had decided to end his sit-in by falsely charging him with armed robbery.

47. "* * * no federal law confers immunity from state prosecution on such charges."
384 U.S. at 827, 86 S.Ct. at 1812, 16 L.Ed.2d at 956.

48. "Under § 1443(1), the vindication of the defendant's federal rights is left to the state courts except in the rare situations where it can be clearly predicted by reason of the operation of a pervasive and explicit state or federal law that those rights will inevitably be denied by the very act of bringing the defendant to trial in the state court."
City of Greenwood, Miss. v. Peacock, 384 U.S. at 828, 86 S.Ct. at 1812, 16 L.Ed. 2d at 957.
The phrase "pervasive and explicit state or federal law" is perhaps somewhat misleading in this context. However, "state law" obviously refers to the sort of law sufficient to support removal under the

ble basis for that forecast are the allegations in the removal petition. In *Rachel* those allegations were sufficient to invoke Federal civil rights removal jurisdiction. In *Peacock* they were not.

On this theory the Supreme Court's cryptic footnote reference in *Peacock* to the Voting Rights Act of 1965 (see note 41, *supra*) still leaves the case easily distinguishable from *Rachel*. Even if prior to their arrests the petitioners had been engaged in protected voter registration activities they would nevertheless not automatically invoke the Act—as *Rachel* had invoked the Civil Rights Act of 1964 —simply by asserting that they had been arrested because of those activities and that the charges were false. The reason is obvious: the conduct charged as a criminal offense in *Peacock* was *not* the conduct protected by the Voting Rights Act.

By failing to allege, in substance, that they were being prosecuted exclusively for their voter registration activities, the petitioners in *Peacock* left open the possibility that they were *also* being prosecuted for criminal misconduct unrelated to the exercise of a Federally protected right.[49] The defendant who is arrested and charged because he has bitten a policeman cannot escape criminal responsibility for the act simply by contending that at the time he was encouraging voter registration, or that the arrest and prosecution are motivated, not simply by the bite, but also by the previous exercise of an equal civil right. Even a conceded collateral infringement of a Federal right does not prevent the State from enforcing its criminal laws against specific types of conduct not immunized against prosecution by a "pervasive and explicit" Federal law.[50]

Likewise, the fact that the charges are false may be of considerable evidentiary significance in the ultimate determination of the purpose underlying the arrest and prosecution, as would be the defendant's race, his previous exercise of "equal civil rights," the nearness or remoteness of the arrest in relation to the exercise of the right, and any number of other factors. But the absence of evidence has nothing to do with the question of whether the petition has invoked the jurisdiction of the District Court by providing in its allegations the basis for the "clear prediction" required by *Rachel*. The State may blunder in good faith. It may initiate criminal prosecutions, even if through error the charges are false, for the purpose of enforcing its criminal law. What it may not do is to arrest and charge a defendant solely because he has previously exercised a right to engage in conduct protected by Federal law against State criminal prosecution.

Of course, since the crucial issue is the motivation underlying the prosecution, nothing in either *Rachel* or *Peacock* rules out the possibility of removal relief *even* when the defendant is guilty of having committed a criminal offense not itself immunized against prosecution. The

---

*Strauder-Rives-Powers* doctrine (i. e. a law which by its operation or application unconstitutionally abridges the defendant's equal civil rights). On the other hand, "federal law" refers to the kind of statute involved in *Rachel* (i. e. a statute that by its own terms prohibits the prosecution of the defendant for conduct protected under Federal law).

49. Of course the second group of petitioners *did* allege that they were being prosecuted *solely* for protesting "racial discrimination in Mississippi." But that conduct was not immunized against unwarranted criminal prosecution under either the 1964 or 1965 civil rights laws. Its time did not come until the enactment of the provision we consider here, Title I of the Civil Rights Act of 1968, 18 U.S.C.A. § 245(b).

50. "Clearly, the state and its subdivisions may reasonably enforce their criminal laws. Often such valid enforcement may incidentally have an inhibiting or intimidating effect upon the exercise of a protected right. Yet, the unfortunate incidental effect may not be grounds for setting aside or enjoining the otherwise justifiable enforcement of the valid criminal law."

United States v. Leflore County, 5 Cir., 1967, 371 F.2d 368, 371; see also 18 U.S.C.A. § 245(c), quoted in the Court's opinion, *supra*.

Federal civil rights laws do not by their terms grant immunity from prosecution for all violations of State law simply because those violations occurred in conjunction with the exercise of a Federal right. But they do grant broad immunity against any prosecution motivated exclusively by a purpose to intimidate the defendant, whether guilty or not, because —and *only* because—he has exercised a Federally protected right. The removal statute, like the Federal injunction, provides the means for invoking that immunity.[51]

Finally, since both *Rachel* and *Peacock* hinge on the prosecutorial motive alleged —or, in *Peacock*, not alleged—to support the claim for removal relief, there is no inherent necessity for the allegedly criminal misconduct underlying the prosecution to be either temporally or geographically concurrent with the exercise of the equal civil right. The issue under *Rachel* is why the defendant was arrested, not when or where he was arrested, or what he is charged with having done. The individual who seeks nondiscriminatory admission to a place of public accommodation and then is arrested several miles or hours later on spurious charges arising solely from his prior exercise of a Federal right is being "punished" in precisely the sense prohibited by the 1964 Civil Rights Act. The removal remedy

may legitimately be invoked under such circumstances.

### *Peacock-Rachel* Considered— and Reconsidered

At least one fact should now be clear: that "the right of removal of a state criminal prosecution has not been restricted by the Supreme Court to the small group of cases in which a state prosecution *for trespass* seeks to forbid the enjoyment of the right to equal accommodations guaranteed under Title II of the Civil Rights Act of 1964." Whatley v. City of Vidalia, 5 Cir., 1968, 399 F. 2d 521. Yet the two divergent judicial interpretations of *Rachel* and *Peacock* that emerged during the succeeding five years parted company on almost precisely that point—whether *Peacock* did restrict *Rachel* to its facts, rather than to the legal principles it prescribed.

The first approach to interpreting *Peacock*, exemplified by decisions of the Second,[52] Third[52A] and Fourth [53] Circuits and in a dissenting opinion by one of our own Judges,[54] may be characterized as the "scope of conduct" theory. Essentially the reasoning is as follows: one of the major considerations underlying the Supreme Court's rejection of an expansive interpretation of the removal statute in *Peacock* was the necessity for avoiding a protracted evidentiary hearing in-

---

51. See, e. g., United States v. McLeod, 5 Cir., 1967, 385 F.2d 734, 744:

"* * * every indication is that the police made arrests not to redress violations of the law, but simply to harass voting workers. It is common knowledge that the police often overlook violations of relatively trivial traffic laws. Rarely if ever do police mount massive law enforcement drives to eradicate the sinful practice of driving with burned out license-plate lights. When they do so on the evening of a voter registration meeting and, fortuitously of course, catch twenty-nine Negroes on their way home from that meeting and no one else, the inference of justifiable enforcement * * * loses much of its force. What little force is left is dissipated by the history of official obstruction of the voting registration process so clearly es-

tablished in this record. The *only purpose* was to harass voting workers—a purpose proscribed by the [Voting Rights Act of 1965]."

(Emphasis added.) Cf. Duncan v. Perez, 5 Cir., 1971, 445 F.2d 557, cert. denied, 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 254.

52. New York v. Davis, 2 Cir., 1969, 411 F.2d 750, cert. denied, 396 U.S. 856, 90 S.Ct. 119, 24 L.Ed.2d 105.

52A. Hill v. Pennsylvania, 3 Cir., 1971, 439 F.2d 1016, cert. denied, 404 U.S. 985, 92 S.Ct. 445, 30 L.Ed.2d 370.

53. North Carolina v. Hawkins, 4 Cir., 1966, 365 F.2d 559, cert. denied, 385 U.S. 949, 87 S.Ct. 322, 17 L.Ed.2d 227.

54. Judge Godbold, in Achtenberg v. Mississippi, 5 Cir., 1968, 393 F.2d 468, 475.

quiring into the prosecution's merit or lack of merit—in effect a trial of the defendant on State charges in a Federal court. City of Greenwood, Miss. v. Peacock, 384 U.S. at 832–834, 86 S.Ct. at 1814–1816, 16 L.Ed.2d at 959–961. Consequently, any interpretation of *Peacock* that suggests such an approach, such as the theory that the petitioner in a removal action may succeed if he alleges and proves a causal connection between his Federally protected activity and his prosecution, is probably incorrect.

Instead, according to this reasoning, the defendant must allege and prove that the *conduct charged to be a violation of State law* is immunized against prosecution under the requisite "equal civil rights" law.[55] This conclusion is supposedly compelled by the language in *Peacock* to the effect that the falsity of the charges or the "corrupt denial" of the defendant's equal civil rights prior to trial is not enough, by itself, to support removal (see note 30, *supra*), and by the fact that the petitioners in *Peacock*, unlike those in *Rachel*, were charged and prosecuted for conduct not itself immunized against prosecution by Federal law.

On the other hand, the Fifth Circuit has adopted what might best be described as a "causal relation" theory of *Peacock*, which entails a determination of whether the defendant's arrest and prosecution, even though ostensibly resulting from conduct entirely unrelated to the previous exercise of a Federally protected right, were nevertheless motivated exclusively by conduct protected against State criminal prosecution by Federal law. The occasion for this choice between competing interpretations was Achtenberg v. Mississippi, *supra*, note 54.

In *Achtenberg* the Court was confronted with allegations in a removal petition that "the prosecution's charges of vagrancy were based *exclusively* on attempts by the appellants to exercise rights guaranteed them under the 1964 Civil Rights Act." 393 F.2d at 469 (emphasis added). Four of the defendants had actually been arrested and charged while seeking racially nondiscriminatory service at the public library in Hattiesburg, Mississippi. The fifth defendant, a white teacher named Sandra Adickes, was arrested several days earlier. She and several of her Negro friends had sought and were refused service at the library, after which they went to the local Kress store to eat lunch, where Miss Adickes was again refused service because she was accompanied by Negroes.[56] Leaving the store,

---

**55.** "The line [between *Rachel* and *Peacock*] is thus between prosecutions in which the conduct necessary to constitute the state offense is specifically protected by a federal equal rights statute under the circumstances alleged by the petitioner, and prosecutions where the only grounds for removal are that the charge is false and motivated by a desire to discourage the petitioner from exercising or to penalize him for having exercised a federal right."

New York v. Davis, *supra*, note 52, 411 F.2d at 754. See also Hill v. Pennsylvania and North Carolina v. Hawkins, *supra*, notes 52a and 53.

**56.** This aspect of the case has an interesting sequel. Upon returning to her home in New York Miss Adickes filed a suit for damages under 42 U.S.C.A. § 1983, alleging deprivations of Federal rights resulting from the refusal of service and a purported conspiracy between the store employees and the police to effect her arrest on a spurious charge of vagrancy. The District Court granted summary judgment for the defendant, and the Court of Appeals affirmed. In reversing, the Supreme Court pointed out that the plaintiff "will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow reached an understanding to deny Miss Adickes service in the Kress store, or *to cause her subsequent arrest* because she was a white person in the company of Negroes." Adickes v. S. H. Kress and Company, 1970, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142, 151 (emphasis added).

The Court also held that the plaintiff was entitled to recover if she could prove "that Kress' refusal to serve her *was motivated by* [a] state-enforced custom [of racial segregation]." 398 U.S. at 174, 90 S.Ct. at 1617, 26 L.Ed.2d at 163 (emphasis added).

Miss Adickes was immediately arrested for vagrancy on the sidewalk in front of it.

The Court found the affidavits of the petitioners were by themselves sufficient to support the allegation "that the conduct which *caused* the arrest of these five persons under the vagrancy statutes * * * was conduct which was clearly protected under the provisions of * * the Civil Rights Act of 1964." 393 F.2d at 474 (emphasis added). Characterizing the vagrancy law as a "convenient tag" attached to activities immunized by Federal law against criminal prosecution, the Court remanded with instructions to dismiss all of the charges.

Judge Godbold concurred in this disposition as to the charges against the four petitioners actually arrested inside the library, agreeing that "the use of the label 'vagrancy' in the charges against them instead of the label 'trespass' does not require a result different from *Rachel*." 393 F.2d at 476. However, he dissented as to the case against Miss Adickes. Conceding that the vagrancy charge was "baseless and an unsophisticated subterfuge," his reasoning was that *Peacock* had nevertheless specifically held that allegations of groundless charges, corrupt motives to deny Federal equal civil rights or an alleged prospective denial of a fair trial in State courts were insufficient to invoke removal jurisdiction. He concluded that "an outrageous denial of federal rights is not coterminous with a right to remove under § 1443(1). * * * Closeness or even concurrence is not the test—scope and quality of conduct charged to be a violation of law, measured against the four corners of conduct the exercise of which is guaranteed by the 1964 Act, is the test." *Id.* Thus, "charges are removable if quantitatively and qualitatively they involve conduct coterminous with activity protected under the Civil Rights Act." 393 F.2d at 477. This interpretation of *Peacock* is virtually identical to that adopted by the Second, Third and Fourth Circuits (see note 55, *supra*).

### Inadequacy of the "Scope of Conduct" Theory

At this point I actually need do no more than point out that the "causal connection" test prescribed by *Achtenberg* is still the law in this Circuit and that we are bound to follow it in the present case. However, in view of the fact that our adopted interpretation of *Peacock* is contrary to the conclusions reached by at least three other circuits, I feel compelled to state my reasons for believing that the "causal connection" approach is the correct one.

In the first place the most obvious difficulty with the "scope of conduct" test is that it completely nullifies the reasoning in *Rachel*. There the Supreme Court held that State criminal prosecutions are subject to removal if the defendant alleges and proves that the exclusive purpose of the proceedings is to "punish" him for conduct immunized by Federal law against "attempted punishment." Under such circumstances the very pendency of the prosecutions enables a Federal court to make the "clear prediction" that the defendant's equal civil rights will be denied by the very act of bringing him to trial. The punitive consequences of such prosecutions are not alleviated simply because the defendant is maliciously charged with allegedly unrelated criminal misconduct rather than the acts protected by Federal law. The result in either case is the same: impermissible State interference with the exercise of rights Congress has immunized against intimidation.

In the second place the "scope of conduct" approach permits effective vindication of Federal rights through the removal remedy to be effortlessly circum-

---

Miss Adickes, apparently a politically active sort, was subsequently involved in another attempt to invoke removal jurisdiction. It failed. See New York v.

Horelick, 2 Cir., 1970, 424 F.2d 697, cert. denied, 398 U.S. 939, 90 S.Ct. 1839, 26 L.Ed.2d 273.

navigated by the simple expedient of holding the spurious arrest in abeyance until *after* the right has been exercised and the innocent defendant has begun to engage in "unprotected activity." Under such a standard it would not be at all difficult to imagine the spectacle of a Thomas Rachel or a Sandra Adickes, cowering inside the sheltered sanctity of the restaurant or public library in the exercise of Federally protected rights, yet afraid to step outside into the arms of police officers waiting around the corner with trumped-up charges of vagrancy, bigamy or second-degree murder. An interpretation of *Peacock* entailing such consequences carries its own refutation.

In the third place the argument that the distinction between *Rachel* and *Peacock* lies in the scope of the evidentiary hearing necessary to determine whether Federal rights have been violated by State criminal prosecutions overlooks entirely the fact that in either case the ultimate issue is the same—the motivation for the proceedings. Arrests and prosecutions arising from peaceful attempts to gain service in places of public accommodation (as in *Rachel*) do not automatically entitle a defendant to remove his case to a Federal court. The petitioner must still allege and prove that he was arrested and prosecuted *only* because of that attempt and that his efforts were thwarted *only* because he was a Negro. Resolving such issues requires a factual inquiry no less extensive than that needed to determine whether prosecutions for "unprotected" conduct are merely smokescreens for an officially sanctioned deprivation of Federal rights.[57]

In the fourth place any argument in support of the "scope of conduct" interpretation that suggests *Peacock* intended to limit *Rachel* to its facts as part of a compromise between the competing demands of Federalism and the vindication of individual civil rights[58] comple-

---

57. See, e. g., City of Baton Rouge v. Douglas, 5 Cir., 1971, 446 F.2d 874. There a defendant charged in a Louisiana State court with the offense of disorderly conduct alleged that his arrest and prosecution arose exclusively from his attempts to secure nondiscriminatory service at a restaurant subject to the Civil Rights Act of 1964. The manager had refused admission, allegedly because the defendant was not wearing a coat and tie, although several white patrons were also not wearing coats and ties. Douglas called the police and demanded their help in securing service. Instead he was arrested. We remanded to the District Court for a full evidentiary hearing.

See also Walker v. Georgia, 5 Cir., 1969, 405 F.2d 1191, where the defendant's attempt to secure service led to a charge of assault. We remanded for additional findings by the District Court after pointing out that the victims of the petitioner's alleged assault "just happened to be armed with a pistol and blackjack." 405 F.2d at 1192. And see Wyche v. Louisiana, 5 Cir., 1967, 394 F.2d 927.

58. See, e. g., New York v. Davis, *supra*, note 52:

"The distinction thus made by the [Supreme] Court [in *Rachel* and *Peacock*] is responsive to the proper work-ing of our federal system. * * * It is undesirable, especially with respect to criminal prosecutions, that a removal statute should require a preliminary trial in the federal court of the issue of removability * * *; avoidance of this was one of the purposes of the *Strauder-Rives* reading of the predecessor of § 1443(1). While *Rachel* does entail in some instances a trial preliminary to the determination of federal jurisdiction, this is on what the Court evidently considered to be a rather narrow issue, whether the conduct charged is within the area withdrawn by the federal statute from the ambit of allowable state prosecution—not, as is here proposed, on the very question that is the subject of the state criminal charge. The Supreme Court has determined that neither the language nor the history of § 1443(1) supports a conclusion that Congress meant to disrupt so radically the criminal processes of the fifty states and to impose so considerable a burden on the federal courts throughout the nation."
411 F.2d at 754–755.

This analysis involves both an inconsistency and a misapprehension. The inconsistency lies in assuming that only conduct *charged as a criminal offense* "is within the area withdrawn by the federal

ly disregards the fact that equivalent limitations have not been imposed on an even broader Federal remedy—the granting of injunctive relief against pending State criminal prosecutions brought in bad faith solely for purposes of harassing the defendant's exercise of a Federal constitutional or statutory right.[59] It is hardly plausible to contend that *Peacock* prescribes a policy of non-interference by way of removal under circumstances that would entitle the defendant to an injunction.

Finally the "scope of conduct" test implies, as a practical matter, that the Federal civil rights removal remedy is no remedy at all, except under precisely the circumstances that existed in *Rachel.* No matter how plain the fact on the undisputed evidence that the defendant is "denied or cannot enforce" in State courts a right under a specific Federal statute providing for equal civil rights in terms of race—the standard for removal prescribed by *Rachel*—he still will be unable to vindicate that right under §

1443(1) unless he was, in effect, charged for exercising it. I think that result is clearly inconsistent with the terms of the removal statute itself.

The Significance of *Younger v. Harris*

Probably the most compelling reason for rejecting the "scope of conduct" interpretation of *Peacock*, however, is provided by an analysis of the parallel remedy of Federal injunctive relief against pending State criminal prosecutions. In a series of opinions clarifying its earlier decision in *Dombrowski* (see note 59, *supra*) the Supreme Court has reaffirmed the long-established principle that as a prerequisite for an injunction the defendant must allege and prove irreparable injury in the form of "special circumstances," such as facts establishing that the criminal proceedings have been initiated in bad faith only for the purpose of harassing and intimidating the exercise of a constitutional right.[60] On the other hand the Court has also clearly spelled out those circumstances

---

statute from the ambit of allowable state prosecution." The 1964 and 1968 Civil Rights Acts and the Voting Rights Act of 1965 prohibit not merely open and obvious official harassment but *all* actual or attempted interferences with the exercise of Federal rights protected under those statutes, regardless of whether the technique is overt or clandestine, direct or indirect, immediate or remote. Spurious arrests and prosecutions designed to effect that purpose are no less illegal simply because they ostensibly arise from unrelated activities.

The misapprehension arises from the mistaken assumption that any alternative interpretation of *Peacock* necessitates a determination of the defendant's guilt or innocence. It does not. A District Judge does not try the issue of the petitioner's guilt in a removal action, no more than he must determine the guilt or innocence of a defendant seeking injunctive relief against alleged bad-faith prosecution. All he need do in both cases is simply to determine on the basis of the available evidence before him, *including* the sufficiency of the evidence to support a conviction, whether the allegations are true. See note 87, *infra*; cf. Cameron v. Johnson, 1968, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182.

59. See Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 and the discussion of Younger v. Harris and companion cases, *infra*.

60. Younger v. Harris, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669; Samuels v. Mackell, 1971, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688; Boyle v. Landry, 1971, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696; Perez v. Ledesma, 1971, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701; Dyson v. Stein, 1971, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781; Byrne v. Karalexis, 1971, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed. 2d 792.

Federal courts should refuse "to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent. * * * No person is immune from prosecution *in good faith* for his alleged criminal acts." Douglas v. City of Jeannette, 1943, 319 U.S. 157, 163, 63 S.Ct. 877, 881, 87 L.Ed. 1324, 1329 (emphasis added); cf. Ex parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714. See also Hudson v. Wanick, 5 Cir., 1971, 444 F.2d 218; Jackson v. Dobbs, 5 Cir., 1971, 442 F.2d 928; Gordon v.

that, by themselves, are not sufficient to justify anticipatory relief from a Federal court. The considerations relevant here, while not precisely identical to those involved in *Rachel* and *Peacock,* are nevertheless remarkably similar.[61]

For example, mere allegations that the criminal statute under which the defendant is being prosecuted is vague and overbroad, or that its enforcement has a "chilling effect" on the exercise of particular constitutional rights, do not show the requisite irreparable injury, since they provide no basis whatever for the assumption that the statute is being applied in an unconstitutional manner or that the State courts would sanction such an application. Likewise, even a showing that the State has incidentally abridged constitutional rights in pursuit of the legitimate objective of enforcing the criminal law is not enough.[62] Due regard for maintaining intact the principles of Federalism and comity requires that the ultimate correction of

those wrongs be left to the State courts or, upon their default, by the Supreme Court. There is simply no place in a Federal system for the *a priori* presumption that Federal Judges are more inclined or better able than State Judges to carry out the dictates of the Constitution.[63]

Even if it is granted that a State's enforcement of its criminal laws is tainted by an ignoble purpose, the human frailties of the agents for enforcement —police officers and prosecutors—do not automatically insulate against criminal prosecution those who have broken the law. Historically the dual responsibilities of enforcing the law and protecting individual rights have remained primarily with the States. The difficult and progressively burdensome task of effectively carrying out these responsibilities could not be accomplished if the States' good-faith efforts were to be periodically disrupted by Federal courts whenever the defendant can discover and

Landrieu, 5 Cir., 1971, 442 F.2d 926; Star-Satellite, Inc. v. Rosetti, 5 Cir., 1971, 441 F.2d 650; Peoples v. City of Birmingham, 5 Cir., 1971, 440 F.2d 1352; Thevis v. Moore, 5 Cir., 1971, 440 F.2d 1350; Gornto v. Thomas, 5 Cir., 1971, 439 F.2d 1406.

61. There is something of more than passing significance in the fact that Mr. Justice Stewart's opinion for the Court in *Peacock* suggests injunctive relief as a possible alternative to the civil rights removal remedy, 384 U.S. at 829, 86 S.Ct. at 1813, 16 L.Ed.2d at 957, while his subsequent concurrence in *Younger* intimates that the rationale underlying the denial of anticipatory relief absent a showing of "official lawlessness" cannot be extended to situations in which the illegitimacy of the State's action has been proven. "In such circumstances the reasons of policy for deferring to state adjudication are outweighed by the injury flowing from the very bringing of the state proceedings, by the perversion of the very process which is supposed to provide vindication, and by the need for speedy and effective action to protect federal rights." 401 U.S. at 56, 91 S.Ct. at 757, 27 L.Ed.2d at 682. Immediately following this statement Mr. Justice Stewart cites *Rachel.*

Compare the similar reasoning in *Peacock,* note 48, *supra.*

62. Thus a defendant whose anticipated criminal prosecution may rest upon evidence illegally seized in violation of the Fourth Amendment is not entitled to Federal injunctive relief against such prosecution merely because he can allege and prove that any resulting conviction would be constitutionally infirm. "Dombrowski confirmed the well-established principle that constitutional defenses to a state criminal charge must be initially tested in state rather than in federal courts." Perez v. Ledesma, 1971, 401 U.S. at 117, 91 S.Ct. at 693, 27 L.Ed.2d at 724 (concurring opinion of Brennan, J.); Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138; Douglas v. City of Jeannette, *supra.*

Compare the similar reasoning in *Peacock,* note 30, *supra.*

63. Cf. City of Greenwood, Miss. v. Peacock, 384 U.S. at 828, 86 S.Ct. at 1812, 16 L.Ed.2d at 957: "The civil rights removal statute does not require and does not permit the judges of the federal courts to put their brethren of the state judiciary on trial."

bring forth a constitutional defect in the preliminary proceedings, or can allege and prove that those prosecuting him are not absolutely pure of heart. *Younger* and its companions thus recognize and give effect to the indisputably sound proposition that ordinarily the vindication of a criminal defendant's constitutional rights must initially be left to the State courts.

But the *Younger* cases also explicitly recognize that there are nevertheless extraordinary circumstances in which the usually persuasive considerations of comity and a proper regard for the primacy of State courts in our Federal system have no place. A State can have no legitimate interest in prosecuting citizens on spurious charges merely for the purpose of harassing and intimidating the exercise of a Federal right. On the other hand, those subjected to such prosecutions (and others who may be threatened with them) have a paramount interest, not merely in gaining ultimate acquittal in a criminal proceeding, but in never being brought to trial at all. In such circumstances there is no necessity for weighing State against individual interests. In all respects the balance is in favor of the individual and against the State "when a State, under the pretext of preserving law and order uses local laws, valid on their face, to harass and punish citizens for the exercise of their constitutional rights or federally protected statutory rights." Cox v. Louisiana, 5 Cir., 1965, 348 F.2d 750, 752.

The *Younger* sextet therefore explicitly sanctions anticipatory Federal relief when the defendant can allege and prove that the prosecution has been instituted in bad faith for purposes of harassment,

rather than in good faith for the purpose of enforcing State criminal laws. The counterargument that the defendant will ultimately prevail at his trial if he is innocent carries no weight at all in that case, because the very pendency of the prosecution entails the deprivation of a Federal right—the right to pursue in a lawful manner the freedom guaranteed by the Constitution without being required as a precondition to defend against an illegitimate criminal charge. When Federal Judges grant such relief they do not by implication cast aspersions at their brethren on the State bench. Extraordinary circumstances require extraordinary relief. Time is of the essence, and in order to obviate the intimidatory effects of the spurious proceedings they must be stopped at once, not several weeks, months or years after they are initiated. "Accordingly, in this context a [Federal] civil suit is an appropriate means to cut short the unconstitutional state prosecution." Perez v. Ledesma, 401 U.S. at 118, 91 S.Ct. at 694, 27 L.Ed.2d at 725 (concurring opinion of Brennan, J.).

Like the philosophy of *Younger* itself, the logic of the "special circumstances" exception is virtually indisputable. The same irrefutable logic applies to all remedies for the deprivation of Federal rights by means of illicit State criminal proceedings, including the exercise of civil rights removal jurisdiction under § 1443(1). The fundamental consideration—the purpose underlying the prosecutions—is the same. "Bad faith" and "harassment" are merely shorthand linguistic conveniences for describing a proceeding subject to interdiction by way of injunction,[64] just as the phrase "de-

64. See Justice Brennan's concurring opinion in *Perez*, 401 U.S. at 118 and n. 1, 91 S.Ct. at 693–694, 27 L.Ed.2d at 724–725, citing our decision in *Achtenberg, supra,* and Cameron v. Johnson, 1968, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182. For examples of the judicial interpretation and application of the "bad faith-harassment" standard, see Duncan v. Perez, 5 Cir., 1971, 445 F.2d 557, cert. denied, 404 U.S. 940, 92 S.Ct 282, 30 L.Ed.2d 254; Gaines v. McGraw, 5 Cir., 1971, 445 F.2d 393; Sheridan v. Garrison, 5 Cir., 1969. 415 F.2d 699, cert. denied, 1970, 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685; Shaw v. Garrison, E.D. La., 1971, 328 F.Supp. 390; cf. Morrison v. Davis, 5 Cir., 1958, 252 F.2d 102, cert. denied, 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1075; Browder v. Gayle, M.D. Ala., 1956, 142 F.Supp. 707, aff'd, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114.

nied or cannot enforce" in § 1443(1) denotes a situation in which removal relief may be appropriate. In both cases the issue of paramount importance is whether the defendant is being deprived of a Federal right beneath the veneer of a legitimate criminal prosecution, not whether he is charged with offenses or conduct that are not themselves protected.

Congress has provided the remedy for those deprived of Federal rights because of their race. We cannot assume that the Supreme Court has somehow concluded that those rights are less deserving of protection than the rights of all citizens safeguarded by the Federal injunction.

### Whatley

The "scope of conduct" interpretation of *Peacock* cannot, therefore, be reconciled with *Rachel*. Of course the primary (if not the only) reason why its proponents have adopted it is that *they* cannot reconcile the "causal connection" approach with *Peacock*. We have accomplished this feat in Whatley v. City of Vidalia, 5 Cir., 1968, 399 F.2d 521, although for reasons I do not find wholly satisfactory.

In *Whatley* the petitioners were arrested by city officials while allegedly engaged in peaceful activity designed to encourage voter registration, an activity they alleged was protected under 42 U.S.C.A. § 1973i(b).[65] Of course this was the subprovision of the 1965 Voting Rights Act so cryptically alluded to in a footnote in *Peacock* (see note 41, *supra*). Since *Peacock* had denied removal relief to petitioners who had apparently been engaged in similar activities, and since the Supreme Court had explicitly taken account of § 1973i(b), the question before the Court in *Whatley* was, in effect, whether *Peacock* was controlling.

The Court held that it was not, pointing out that the petitioners in *Peacock* had invoked as grounds for removal relief in the District Court only those provisions of § 1973 which prohibited attempted interference with individuals "voting or attempting to vote." Since at that time the new guarantees provided by the Voting Rights Act of 1965 had not been enacted, the Court concluded that "the protection of the prohibitory language that is now in the statute was not, because it could not be, *invoked* by the movants in *Peacock*. The present movants are not faced with this problem. Their removal petition expressly alleges that they were engaged in acts which were protected by the new statute." 399 F.2d at 526.

The reasoning of the *Whatley* court was thus that the petitioners in *Peacock* were unable to allege deprivations of equal civil rights under the requisite "law providing for equal civil rights" in terms of race and that, regardless of the footnote reference to the succeeding statute, the Supreme Court had denied relief solely on that ground.[66] Quite ob-

---

65. The petitioners in *Whatley* apparently did not allege that they were being prosecuted *exclusively* as the result of their voter registration activities. However, they did explicitly invoke the protective provisions of the Voting Rights Act, alleging that their conduct was "protected from prosecution" under that statute. 399 F.2d at 522. By implication this amounted to the allegation that they were being prosecuted for exercising Federally protected rights *and for no other reason.*

66. The Second Circuit has crossed swords with the Fifth on the significance of this footnote in its elaboration of the "scope of conduct" interpretation of *Peacock*.

"While we do not disagree with the recent decision in Whatley * * * we cannot accept the view of the majority opinion that the *Peacock* court did not take account of § 11(b) of the Voting Rights Act of 1965, which was enacted subsequent to initiation of the state prosecutions there sought to be removed. Mr. Justice Stewart, writing for the majority, referred to [it] * * * and Mr. Justice Douglas made it a principal basis for the dissent * * *."
New York v. Davis, *supra*, note 52, 411 F.2d at 754, n. 3.

However, that Court subsequently conceded that "citation in a footnote would be a rather elliptical way to decide such

viously this satisfactorily distinguishes *Whatley* from *Peacock*, since in *Whatley* the petitioners explicitly relied upon the provisions of § 1973i(b), which the Court found to provide an immunity against prosecution even more broad than the equivalent immunity provided by the 1964 Civil Rights Act.

Unfortunately, while the reasoning in *Whatley* neatly side-steps *Peacock*, it slams head-on into *Rachel*, because there the petitioners *also* did not explicitly "invoke" the protective provision of the 1964 Civil Rights Act. Like the Voting Rights Act in *Peacock*, it had not been enacted at the time the removal petition was filed. Nevertheless the Supreme Court held that *Rachel's* petition had alleged grounds for removal because "it recites facts * * * that invoke application of [the 1964 Civil Rights Act] on appeal." See note 35, *supra*. In short, if *Rachel* were entitled to retroactive application of the 1964 Civil Rights Act to save his removal petition, it might seem that *Peacock* should also have been accorded similar assistance in connection with the Voting Rights Act of 1965.[67]

### The Adequacy of the "Causal Connection" Test

If, then, 1973i(b) is an adequate statutory vehicle for the exercise of removal jurisdiction—and, like the Court in *Whatley*, I believe that it is—the only possible distinction between *Rachel* and *Peacock* (other than the untenable one already discussed in connection with the "scope of conduct" test) must lie in the "factual recitation" in the removal petitions. In other words, after excluding the demonstrably unlikely hypothesis that the Supreme Court intended to limit

removal jurisdiction exclusively to those circumstances in which the conduct actually charged as a criminal offense is protected by Federal law against prosecution, there are logically only two possibilities remaining: either (i) § 1973i (b) is for some reason distinguishable from the statute found sufficient in *Rachel* (an unlikely possibility, since that distinction is rationally inexplicable) or (ii) the "factual recitations" in the *Peacock* petitions were simply insufficient to invoke removal jurisdiction under the terms prescribed by *Rachel* (as I have previously suggested).

Judge Sobeloff of the Fourth Circuit has, reluctantly, adopted the first alternative. "Since § 1971 did not contain the specific prohibition against state action that 'punish[es] or attempts to punish' present in *Rachel* the Court distinguished voting rights cases from public accommodations cases, and refused to permit removal. Under this interpretation of § 1971(b), which is binding upon me, I agree that the present case must be held not entitled to removal." North Carolina v. Hawkins, *supra*, note 53, 365 F.2d at 562–563 (concurring opinion).

However, in the immediately preceding sentence he states that "in *Peacock* * * * where the voting rights provisions of § 1971 were invoked in support of a removal claim, the Supreme Court held that 'no federal law confers immunity from state prosecution[s]' growing out of attempts to secure the right to vote." *Id.* at 562. As I have pointed out, however, that is not what the Supreme Court held at all.

The Supreme Court simply held that the allegations of the *Peacock* petitions were not sufficient to invoke civil rights removal jurisdiction because, as required

an important question" and left it open. New York v. Horelick, *supra*, note 56, 424 F.2d at 702–703, n. 4.

67. Of course, this point might be refuted by the contention that the Supreme Court, for reasons known only to itself, decided against giving retroactive application to the 1965 Act. However, the discussion of the retroactive application of the 1964 Act

in Hamm v. City of Rock Hill, 379 U.S. at 312–317, 85 S.Ct. at 389–392, 13 L.Ed. 2d at 305–308, coupled with the complete absence of any mention of the retroactivity question in *Peacock*, leads me to believe that the Supreme Court never explicitly considered the problem and simply assumed that the 1965 Act was applicable to conduct that took place prior to its enactment.

by § 1443(1), they did not assert that the defendants were "denied or [could] not enforce" their equal civil rights in the State courts. They might have done this, theoretically, by invoking an explicit Federal statute providing for equal civil rights in terms of race, but that statute (the Voting Rights Act of 1965) had not been enacted when their removal petition was filed in the District Court. Alternatively, they might have asserted —as the *Rachel* petition did—that the arrests, charges and prosecutions arose *exclusively* from conduct subsequently insulated against criminal prosecution by a fortuitously enacted equal civil rights statute. But they did neither of these things. In effect, *Peacock* was dismissed for failing to state a claim.

Nor is this interpretation shaken by the otherwise universally acknowledged precept that pleadings in Federal courts are to be liberally construed. As the Supreme Court has held for at least thirty years—and as it certainly held in *Rachel* and *Peacock*—the policy underlying the removal statute is "one calling for the *strict construction* of such legislation." Shamrock Oil & Gas Corp. v. Sheets, 1941, 313 U.S. 100, 108, 61 S.Ct. 868, 872, 85 L.Ed. 1214, 1219 (emphasis added). By implication, that policy calls for strict construction of removal petitions as well.

On this analysis of *Peacock* it is now clear that the "causal connection" approach we adopted in *Achtenberg* is the correct one. Regardless of the physical and temporal immediacy or remoteness of the conduct charged as a criminal offense to the actual exercise of Federal equal civil rights, the petitioner in a removal action is entitled to relief if (i) he alleges, either explicitly or by implication, that criminal proceedings have been instituted against him exclusively because he has previously participated in activities insulated against prosecution by a preemptive Federal statute providing for equal civil rights in terms of race, and (ii) he proves those allegations. Under such circumstances a Federal court is provided with the basis for a "clear

prediction" that by the very fact of being brought to trial in a State court the defendant will be "denied or cannot enforce" his Federal rights. That is all that § 1443(1), *Rachel*, and *Peacock* require.

### Davis

For the foregoing reasons I believe the decision in *Whatley's* companion case, Davis v. Alabama, 5 Cir., 1968, 399 F.2d 527, was incorrect. There the petitioner alleged that "the arrest and prosecution were being carried on *with the sole purpose and effect* of harassing the petitioner and of punishing him and others for, and deterring him and others from * * * urging Negroes to register for voting free of racial discrimination." 399 F.2d at 528 (emphasis added). Such conduct was clearly immunized against State criminal prosecution under § 1973i(b), as the Court had held in *Whatley*.

However, the Court had also held in *Whatley* that the distinction between that case and *Peacock* was that the defendants there had explicitly invoked in their removal petition § 1973i(b), while the *Peacock* petitioners had been unable to invoke the same provision because it had not yet been enacted. Therefore, the Court in *Davis* reasoned that since the defendant relied on § 1971's prohibition against intimidation directed against voting (rather than § 1973i(b)'s proscription of interference with those "urging or aiding" others to vote) "there was no explicit prohibition by a federal statute against the intimidation, threat or coercion which Davis contends was the basis of his arrest." 399 F.2d at 528.

The problem with this analysis is that it apparently overlooks the fact that in *Rachel* the petitioners also did not explicitly invoke the relevant provisions of the 1964 Civil Rights Act but were nevertheless held to be entitled to its protection because their petition recited facts that invoked application of the Act on appeal. See note 35, *supra*. In *Davis* the petition likewise "recited facts" that invoked application of § 1973i(b), even

though the petitioner ostensibly relied on an altogether different statutory provision. If *Rachel* was entitled to rely on the factual allegations in his petition to invoke the application of the 1964 Civil Rights Act, I believe that *Davis* was likewise entitled to relief under the 1965 Voting Rights Act on the basis of the allegations in his petition.

### The Sufficiency of the Petition

Beyond any doubt the removal petition here meets the stringent criteria prescribed by *Rachel* and *Peacock*. In addition to invoking the provisions of a specific Federal statute providing for equal civil rights in racial terms, it also explicitly negates any hypothesis that the alleged deprivation of equal civil rights resulted from legitimate efforts of the State of Mississippi to enforce otherwise valid criminal law.[68]

The statute upon which the petitioners rely, 18 U.S.C.A. § 245, was enacted by

Congress as Title I of the Civil Rights Act of 1968.[69] By its plain terms it provides broad protection for numerous categories of specifically enumerated "Federally protected activities" and prohibits any attempt by force or threat of force, whether or not under color of law,[70] to injure, intimidate or interfere with any person for engaging or for having engaged in such activities.[71] More precisely the statute proscribes interference with any person "aiding or encouraging other persons to participate, without discrimination on account of race [or] color * * * in any of the benefits or activities" described, or similar interference with any person participating "lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate." § 245(b) (5), note 25, *supra*. The activities of the 23 appellants in connection with the Mendenhall protest demonstrations fit precisely within this category.[72]

68. The petitioners allege that all of the charges "have no basis in fact and have been effectuated solely and exclusively for the purposes and effect of depriving petitioners of their Federally protected rights, including by force or threat or force, punishing, injuring, intimidating, and interfering, or attempting to punish, injure, intimidate, and interfere with petitioners, and the class of persons participating in the Simpson County boycott and demonstrations, for the exercise of their rights peacefully to protest discrimination and to conduct and publicize a boycott which seeks to remedy the denial of equal civil rights * * * which activities are protected by 18 U.S.C. § 245." (App. 15.)

69. Pub.L. 90–284, 82 Stat. 73; see also S.Rep. 721, 90th Cong., 2d Sess. (1967), 1968 U.S. Code Cong. & Admin. News, p. 1837.

70. Beyond any doubt State police officers who deprive citizens of Federally protected rights by means of false arrest, imprisonment and prosecution are acting "under color of law." United States v. Classic, 1941, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368, 1383; Monroe v. Pape, 1961, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492, 505; Anderson v. Nosser, *supra*, 438 F.2d at 188. See also Tolbert v. Bragan, 5 Cir., 1971, 451 F.2d 1020.

71. Compare the language of § 245(b) with 42 U.S.C.A. § 2000a–2(c), the statute utilized as a vehicle for removal in *Rachel*. Since "injury, intimidation or interference" by "force or threat of force" is at least the linguistic equivalent of "punish," § 245(b) must likewise provide an identical basis for removal, since "on its face, this language prohibits prosecution" for the exercise or attempted exercise of equal civil rights. Hamm v. City of Rock Hill, 1964, 379 U.S. 306, 311, 85 S.Ct. 384, 389, 13 L.Ed.2d 300, 304.

72. See notes 5 and 25, *supra:*

Section (1) (C): "applying for or enjoying employment, or any perquisite thereof, by any agency of the United States;" ("We demand Black Employees in the post office, FHA office, ASCS office, food stamp office, welfare office * * *" and "We demand Black 30% of employees and voting members of the local draft board.") Section (2) (A): "enrolling in or attending any public school or public college;" ("We call for complete school desegregation.")

Section (2) (B): "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;" ("We demand desegregated recreational facilities and Black

Admittedly we have only recently held in connection with an unsuccessful attempt to remove a pending State *civil* proceeding to a Federal court that § 245 (b)'s interdiction of attempted injury, intimidation or interference "by force or threat of force" does not extend to a quo warranto action brought by the State of Mississippi to revoke the charter of a nonprofit corporation operating a free health service program for the benefit of poor people, primarily Negroes, in Jackson and Hinds County. Williams v. Tri-County Community Center, 5 Cir., 1971, 452 F.2d 221.[73] Whatever the merits of such an approach in those circumstances, it cannot legitimately be applied here to bar removal of a pending State *criminal* prosecution.

### "Force Or Threat Of Force"

In the first place, apart from the fact that arrest, confinement and criminal prosecution are all inherently coercive in nature (and therefore invariably

entail utilization of "threats of force"), Congress plainly did not intend for the courts to narrowly circumscribe the ambit of impermissible intimidation prohibited by the Civil Rights Act of 1968. Title I was the legislative response to a long, sordid history of violent and nonviolent harassment directed against civil rights workers, black and white, who spoke out against the national disgrace of racial segregation. No one who participated in its enactment could have been so naive as to believe that the official and unofficial techniques for silencing dissent were confined to physical brutality. The force employed assumed a variety of forms, from the sheriff's blackjack, cattle prod and tear gas to confinement for "investigation" followed by cold-blooded murder.[74] There were also more covert measures, including mass arrests on trumped-up charges, denial of bail, and convictions grounded on nonexistent evidence coupled with ridiculously severe sentences. We need undertake no exten-

full-time city-paid personnel hired as supervisors.")

Section (2) (C) : "applying for or enjoying employment, or any perquisite thereof, by any private employer or any agency of any State or subdivision thereof * * *" ("We demand 30% of all employment in all business establishments as we are 30% of the buying population. We also call for employment of Black citizens in city hall, court house.")

Section (2) (F) : "enjoying the goods, services, facilities, privileges, advantages or accommodations of any * * * restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises * * *" ("We demand the closing of all back-door cafes.")

73. In reaching this conclusion the Court incorporated into its opinion as *dictum* the Second Circuit's reasoning that "intimidation 'by force or threat of force,' * * denotes violent activity, not the ordered functioning of state legal processes, whatever the motivation." New York v. Horelick, 2 Cir., 1970, 424 F.2d 697, 703, cert. denied, 398 U.S. 939, 90 S.Ct. 1839, 26 L.Ed.2d 273. However, the abortive removal effort in *Horelick* involved a

criminal rather than a civil action, a factor that might well have influenced the Court's attempt to decipher the Delphic pronouncements of § 245(b). The broad brush that the Second Circuit found adequate to paint the limits of permissible Federal intrusion into the administration of a State's criminal law need not necessarily prove sufficient to handle a problem of statutory construction in a civil context where, as Mr. Justice Stewart has pointed out, "for various reasons, the balance might be struck differently." Younger v. Harris, 1971, 401 U.S. 37, 55, 91 S.Ct. 746, 757, 27 L.Ed.2d 669, 682 (concurring opinion).

74. See, e. g., United States v. Price, 1966, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 and Posey v. United States, 5 Cir., 1969, 416 F.2d 545, cert. denied, Snowden v. United States, 1970, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127, memorable cases involving three civil rights workers —Michael Schwerner, Andrew Goodman, and James Earl Chaney—who were murdered in the summer of 1964 by the Mississippi Ku Klux Klan in cooperation with a Neshoba County deputy sheriff. Earlier the sheriff had arrested Chaney for "speeding" (while he was fixing a flat tire) and had held the other two men "for investigation." See also Anderson v. Nosser, *supra*.

sive search for examples of the official misuse of criminal processes for the purpose of compelling meek subservience to the principle of white supremacy. Our cases are filled with them.[75]

Faced with a problem of this magnitude Congress might have responded with a law protecting proponents of racial equality against interference "by violence or threat of violence." Instead it chose the term "force or threat of force." No more than passing familiarity with the English language is required to discern the difference. The phrase that actually appears in § 245(b) is by far the broader of the two and comprehends not merely threatened or actual physical intimidation but *all* the possible modes of compulsion, official or unofficial, conceivable by the warped minds of those few who seek to discourage or eliminate individuals exercising Federally protected rights. In view of the events that prompted the statute, the prohibitory language could hardly have been less expansive. To exclude harassing criminal prosecutions from the scope of § 245(b)'s immunity simply because beatings and killings may have provided the primary impetus for its enactment is to pay homage to the right while eviscerating the remedy. The ultimate consequence of intimidation is the same, whether the victim is in jail, in the hospital or in the grave.

Stacked against these considerations we have as an alternative only the *ex cathedra* pronouncement that "force" means "violence" and not "force." Somehow the logic of this interpretation escapes me. Without debating the questionable proposition that a law designed to correct the abuses of a century should be strictly construed, I need only

point out that Congress explicitly adopted statutory language broader than "violence or threat of violence" because it wished to accomplish a broader result. An aura of implausibility enshrouds any suggestion that despite its monosyllabic simplicity this purpose has somehow miscarried.

Moreover, even if we were nevertheless to conclude that the ordinary criminal prosecution does not constitute a "threat of force" depriving the defendant of equal civil rights, we could hardly reach the same result when the evidence conclusively establishes that the custodial treatment of the petitioners was not merely violent but devastatingly brutal. Under such circumstances the ensuing proceedings cannot be artificially segregated from the previous illegal force but must be considered as an integral part of one continuous course of action initiated exclusively for the purpose of intimidation. The trial, no less than the arrests themselves and the violence that accompanied them, is merely one more manifestation of an intention to utilize the threat of official force—whether by arresting, confining, and convicting the defendants or by beating them up—to effectively neutralize the lawful exercise of § 245(b) rights.[76]

### "Rights" v. "Benefits"

Another objection that might be advanced against the use of § 245(b) as a vehicle for the exercise of removal jurisdiction is that since it is a criminal statute and by its terms does not explicitly confer substantive "rights" it is therefore not a law providing for "equal civil rights" within the meaning of § 1443(1) and *Rachel*.[77] Such a position is totally

**75.** See, e. g., Anderson v. Nosser, *supra;* United States v. McLeod, 5 Cir., 1967, 385 F.2d 734; N.A.A.C.P. v. Thompson, 5 Cir., 1966, 357 F.2d 831, cert. denied sub nom. Johnson v. N.A.A.C.P., 385 U.S. 820, 87 S.Ct. 45, 17 L.Ed.2d 58; Dilworth v. Riner, 5 Cir., 1965, 343 F.2d 226; Bailey v. Patterson, 5 Cir., 1963, 323 F.2d 201; Meredith v. Fair, 5 Cir., 1962, 328 F.2d 586; United States v.

Clark, S.D.Ala., 1965, 249 F.Supp. 720 (3-judge court); see also the preceding footnote.

**76.** Cf. N.A.A.C.P. v. Button, 1963, 371 U. S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418.

**77.** This possibility was suggested by the Second Circuit in *Horelick, supra,* note 73, 424 F.2d at 702, but the Court found

inconsistent with our well-entrenched policy of according full effect to the broadly remedial objectives underlying the Congressional authorization of Federal civil rights jurisdiction. We have consistently heeded the sweeping exhortation of 42 U.S.C.A. § 1988 to facilitate, rather than hinder, the vindication of those rights. See, e. g., Moreno v. Henckel, 5 Cir., 1970, 431 F.2d 1299; Hall v. Garson, 5 Cir., 1970, 430 F.2d 430; Gomez v. Florida State Employment Service, 5 Cir., 1969, 417 F.2d 569; Brown v. City of Meridian, 5 Cir., 1966, 356 F.2d 602; Lefton v. City of Hattiesburg, 5 Cir., 1964, 333 F.2d 280; Brazier v. Cherry, 5 Cir., 1961, 293 F.2d 401. We cannot retreat from that position now as a result of some ostensibly persuasive substantive difference between a Federal "right" and a Federal "benefit," unless the judicial interpretation and application of the Civil Rights Act of 1968 is to degenerate into a sterile exercise in verbal manipulation. The facts here are grim enough to repel such linguistic frivolity.

But there is an even more fundamental justification for rejecting the restrictive interpretation of § 245 that would limit its application to the *ex post facto* punishment of illegal coercion rather than the prevention of it by way of removal: neither § 1443(1) nor *Rachel* speaks in terms of a law *creating* Federal equal civil rights but of a law *providing* for them.[78] The "right" asserted within the context of this case is the prerogative to peacefully protest racial discrimination free of harassing, bad-faith prosecutions triggered exclusively by that activity. Such a right is, of course, provided for and guaranteed under the First Amendment.[79] While *Rachel* teaches that the broad protection afforded all citizens by the Constitution precludes the characterization of any of its provisions as a "law providing for equal civil rights" within the meaning of § 1443(1), § 245(b)(5) nevertheless provides unique, specific protection—phrased in terms of race—for the First Amendment right to protest segregation. Consequently it is a law *providing* for *equal* civil rights, satisfying the requirements of the civil rights removal statute.

Nothing in either § 245(a)(1) or § 245 (c), which the Court quotes in closing its opinion, suggests a contrary result. Obviously the first subprovision does no more than disclaim a Congressional intent to deprive the States of jurisdiction to prosecute otherwise criminal misconduct that also constitutes a violation of § 245,[80] while the other section merely provides police officers with immunity against possible Federal criminal prosecution for their otherwise *lawful* official acts. Neither of these provisions has any relevance to the facts revealed by the record of this case.

In both its purpose (preventing unwarranted interference with the exercise of Federally protected equal civil rights) and the scope of its prohibition (against attempted injury, intimidation or interference by force or threat of force) § 245(b) is indistinguishable from the relevant provisions of the 1964 Civil Rights Act held sufficient to support re-

---

it unnecessary to decide the question. Likewise *Tri-County, supra,* states that "§ 245 is a criminal statute that in terms confers no rights. It prohibits and provides penalties for certain types of conduct relative to protected activities enumerated therein." 452 F.2d at 223, n. 3.

78. See note 24, *supra;* Georgia v. Rachel, 384 U.S. at 792, 86 S.Ct. at 1790, 16 L.Ed.2d at 933–934.

79. See note 59, *supra.*

80. Even if by some tortuous construction we could somehow conclude that the term

"offense" in this context ("Nothing in this section shall * * * prevent any State * * * from exercising jurisdiction over any *offense* over which it would have jurisdiction in the absence of this section * * * *") refers to the conduct of the petitioners in a removal action rather than to the acts of those who violate § 245 (the obvious referent), there is still no impediment here. "Offense" means a criminal act. These petitioners committed no "offenses." They are merely the victims.

moval jurisdiction in *Rachel.* Unlike *Peacock* this case does not involve the petition's failure to invoke a specific Federal statute providing for equal civil rights in terms of race, either by failing to explicitly rely on such a statute or by neglecting to allege facts from which an exclusive purpose to prosecute protected conduct may be inferred.[81]

The only practical question remaining, then, is the adequacy of the District Court's finding that "no federal right * * * is being violated by a prosecution of these charges * * * whether groundless or not."

### The District Court's Findings: "Fair Trial"

In its opinion accompanying the order remanding the prosecutions the District Court refers on two separate occasions to the absence of evidence establishing that the defendants will be denied a fair trial in the State courts.[82] The Court here concludes that the finding is "supported by the evidence" and also refers to it twice. We are all agreed on this point, because I too have absolutely no doubt that the defendants' trials would be fair and impartial and that the Supreme Court of Mississippi would ultimately redress any transgressions that might result.

Unfortunately this finding, however indisputable it may be, is nevertheless totally irrelevant under the present circumstances to the question of whether or not the prosecutions are removable under § 245(b) and *Rachel.* The Supreme Court,[83] like the Fifth Circuit,[84] has rejected the proposition that the defendant's ultimate acquittal in a criminal trial invariably constitutes a sufficient vindication of Federal rights and an adequate reason for denying anticipatory Federal relief. If the petitioner who seeks removal is able to allege and prove that the very act of bringing him to trial in the State court violates rights protected by a preemptive Federal law providing specifically for equal civil rights in racial terms, his plea for help must be answered with protection from a Federal court. No matter how true, the alternative answer that the defendant will receive a fair trial and eventually will be acquitted in the State courts if he is innocent is, as the Supreme Court has phrased it, "no answer." Georgia v. Rachel, 384 U.S. at 805, 86 S.Ct. at 1797, 16 L.Ed.2d at 941.

There is thus no civil rights removal "abstention doctrine." Cf. McNeese v. Board of Education, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622; Monroe v. Pape, *supra,* note 70. If the allegations and proof satisfy the requirements of § 1443(1)—that is, of *Rachel* and *Peacock*—removal jurisdiction *must* be exercised regardless of the prospective fairness or unfairness of the State's criminal proceedings.

81. See note 35, *supra.*

82. "There is no contention in this case and no evidence in this record to support any suggestion that these petitioners cannot and will not receive a perfectly fair trial of their cases in the state court." (App. 30.) Several paragraphs later the Court again repeats that "there is not one breath of evidence anywhere to be found in this record to support any suggestion [or] inference that every one of these petitioners will not receive a perfectly fair trial of his case in the state court." (App. 34.)

83. See note 38, *supra:* see also Zwickler v. Koota, 1967, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444; Dombrowski v. Pfister, 1965, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22, 29.

84. Even justifiable reliance on State courts for the ultimate vindication of Federal constitutional or statutory rights "does not protect [defendants] from harassment and intimidation by the law enforcement agencies of the city, county, and State. It does not protect them from arrest *en masse* on frivolous or unfounded charges; it does not protect them from continued arrest and incarceration until bond could be deposited for their release; * * * it does not protect them from often expensive litigation until their rights are finally vindicated; it does not protect them from being frightened away from the lawful assertion of their rights and lawful protest against the continued denial of them." N.A.A.C.P. v. Thompson, 5 Cir., 1966, 357 F.2d 831, 838, cert. denied sub nom. Johnson v. N.A.A.C.P., 385 U.S. 820, 87 S.Ct. 45, 17 L.Ed.2d 58.

### The District Court's Findings: "Probable Cause"

The District Court concluded that the defendants' Mendenhall protest activities and their subsequent arrests in adjoining Rankin County were entirely unrelated in a temporal, geographical or causal sense and that "they were not arrested by these officers for doing anything which they had a federal right to do." (App. 35). [85] As the foregoing discussion suggests, this is the pivotal finding upon which all else turns.

Ordinarily our review of such a determination by the Trial Judge would be sharply curtailed by the stringent requirements of the "clearly erroneous" test prescribed by F.R.Civ.P. 52. However, here it is abundantly clear that the District Court was under the misimpression that the only factual issue relevant to a determination of the motive for the prosecutions was the question of whether the initial arrests were supported by probable cause. Indeed, it is obvious from even a cursory reading of the District Judge's opinion that the finding of no "causal connection" between the exercise of insulated § 245(b) rights and the arrests was for the most part, if not entirely, the product of his findings that all of the arrests were made with probable cause.

In other words, the District Court mistakenly assumed that a finding of probable cause for the arrests was a sufficient predicate for denying removal relief *regardless* of whether other evidence —no matter how strong—suggested that the whole affair was exclusively the result of the Mendenhall protest demonstrations. Yet clearly the law is that the District Court in an evidentiary hearing on a removal petition must consider *all* the evidence relating to the purpose of the arrests and prosecutions, not simply the single question of probable cause. [86] The Judge here confined his inquiry to the issue of probable cause and overlooked everything else.

The legitimacy of this characterization is confirmed by the District Court's opinion. There are explicit findings that all of the arrests were made with probable cause, that the Highway Patrol maintained surveillance activities on the Mendenhall demonstrations, that Patrolman Baldwin knew none of the demonstrators before he arrested them and that he "apparently" was motivated by no "animosity," and that the protest activities and subsequent arrests were unrelated.

However, the Court made no explicit findings at all on the following relevant evidentiary issues and presumably declined to consider them:

(i) Whether the van was followed from Mendenhall by a Mississippi Highway Patrol car,

(ii) Whether Baldwin made the statements attributed to him by Huemmer (referring to the defendants as "niggers" and threatening them because of their Mendenhall protests),

---

85. The validity of this conclusion is somewhat tainted by other statements in the District Judge's opinion which suggest that he completely misconceived our holdings in *Achtenberg* and *Whatley, supra.* For example, he distinguished the present case from those the petitioners cited by pointing out that "the charges in every one of those cases not only related to, but actually stemmed from the enjoyment by those petitioners of a right positively given them by Congress under the public accommodations section of the Civil Rights Act." (App. 36).

Of course this is the discredited "scope of conduct" approach we have already rejected in *Achtenberg.* The District Court simply assumed the petitioners were "not arrested for doing anything they had a federal right to do" because they were not *charged* with what is under Mississippi law the criminal offense of protesting racial segregation (see note 95, *infra*). Such a finding is without any redeeming value.

86. The error here is precisely the same as that involved in *Walker v. Georgia*, 5 Cir., 1969, 417 F.2d 5 and the earlier unrelated case of *Walker v. Georgia*, 5 Cir., 1969, 405 F.2d 1191. In both of those instances the District Court had incorrectly assumed that its function was only to determine whether there was some evidence justifying the *arrests* of the defendants.

(iii) Whether Baldwin stated in his radio request for assistance, "I've got a truckload of niggers and there's a white with them,"

(iv) Whether Baldwin said to the students, "You niggers get back in the van,"

(v) Whether Huemmer was beaten by Officer Thames on the way to jail, and whether Thames had threatened Huemmer because of his Mendenhall civil rights activities,

(vi) Whether Thames had previously threatened Huemmer's life,

(vii) Whether Rev. Perkins swung at the sheriff,

(viii) Whether the sheriff beat Rev. Perkins with a blackjack,

(ix) Whether Rev. Brown had previously been arrested earlier in the day by one of the officers who was in the jail that night,

(x) Whether the prisoners in the jail were repeatedly referred to as "niggers," threatened or abused,

(xi) Whether the heads of two of the prisoners were shaved and moonshine whiskey poured on one of them,

(xii) Whether the sheriff or his deputies were drunk,

(xiii) Whether Sheriff Edwards said, "This is the smart nigger, and this is a new ball game, you're not in Simpson County now, you are in Brandon" (see note 18, *supra*),

(xiv) Whether Sheriff Edwards forced Rev. Perkins to read the demands of the Mendenhall demonstrators (see note 19, *supra*),

(xv) Whether the charges against the two leaders of the Mendenhall demonstrations and the circumstances surrounding the alleged offense justified the $5,000 bond,

(xvi) Whether there was any evidence to support the charge of reckless driving against Huemmer or the charges against the students for resisting arrest and carrying a concealed deadly weapon,

(xvii) Whether there was any evidence to support the charges against Rev. Perkins, Rev. Brown and Joe Paul Buckley for carrying concealed weapons, resisting arrest and inciting to riot.

In view of the evidence which the District Court failed to consider, his conclusion that the defendants "were not arrested by these officers for doing anything which they had a federal right to do" is not particularly surprising.

Throughout the hearing and its opinion the District Court repeatedly disclaimed any intention to determine the guilt or innocence of the defendants.[87] Certainly the Judge was correct in assuming that he was not required to try

---

87. "They may be innocent or guilty of these offenses but the only thing I want to find out [is] what federal right these state officers violated for them to be petitioners here. I don't believe the petitioners coming here have any right to speed or resist arrest or carry concealed weapons. Those are not federal rights * * *." (Tr. 164.)

"This court does not find it necessary in a proper discharge of its function to decide as to the guilt or innocence of any of these petitioners." (App. 32.)

The Court here falls into the same trap when it states that "if there is in fact no basis for the charges, that deficiency will be exposed by the evidence adduced and a directed verdict of acquittal will necessarily follow as a matter of law." Such a statement may be perfectly appropriate when there is *some* evidence advanced by the State to justify an inference of good-faith criminal prosecution.

Cf. Cameron v. Johnson, *supra*, note 64, 390 U.S. at 621–622, 88 S.Ct. at 1341, 20 L.Ed.2d at 190–191. But it is not appropriate when there is *no evidence whatever* to support any of the charges and nothing at all in the record suggesting legitimate motives for the prosecutions. See notes 38, 58, 61 and 64, *supra*.

Moreover, despite suggestions to the contrary by the Court, we need hardly resolve credibility choices or conflicting inferences to reach my conclusion. The evidence compelling it is undisputed. In any event there can be no conceivable justification for leaving these supposed "credibility choices" to the District Court when the record is clear that with respect to seventeen material issues of fact the District Court declined to make any findings at all but instead viewed those issues as irrelevant to the most important question in the case. See text, *supra*.

State criminal charges in a Federal court on a petition for removal.[88] But he went further and assumed that he was not even obligated to consider the sufficiency of the evidence as one of the factors—not as the sole factor, but as one of them— in the ultimate determination of the purpose for the arrest and prosecutions. Instead he relied on his findings of probable cause.[89]

The inadequacy of this sort of approach to the problems of proof presented by a civil rights removal action is obvious. Since the testimony of the interested parties is almost invariably confusing and contradictory,[90] an utter absence of evidence to support a criminal charge becomes of critical significance to a determination of whether or not the arrest and prosecution are racially motivated. There can be no meaningful assessment of official motives when the ultimate consequences of official action have remained unexplored.[91] Particularly is this true when most of the defendants are black. It is no mere coincidence that Negroes have figured prominently in many of those cases in which the Supreme Court has reversed State convictions grounded on evidence so insufficient as to constitute a denial of due process of law. Barr v. Columbia, 1964, 378 U.S. 146, 84 S.Ct. 1734, 12 L.Ed.2d 766; Taylor v. Louisiana, 1962, 370 U.S. 154, 82 S.Ct. 1188, 8 L.Ed.2d 395; Garner v. Louisiana, 1961, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207; Thompson v. City of Louisville, 1960, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654; Cole v. Arkansas, 1948, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644; cf. Palmer v. City of Euclid, 1971, 402 U.S. 554, 91 S.Ct. 1563, 29 L.Ed.2d 98; Johnson v. Mississippi, 1971, 403 U.S. 212, 91 S.Ct. 1778, 29 L.Ed.2d 423; Bouie v. Columbia, 1964, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894.

Given the indisputable fact that the District Court's finding regarding the purpose for the arrests and prosecutions [92] is grounded on an inadequate assessment of the evidence resulting from the erroneous application of an improper legal standard, we are not bound in reviewing this record by the familiar restrictions of Rule 52.[93] The pertinent

---

88. Cf., my opinion for the Court in United States v. Holmes County, 5 Cir., 1967, 385 F.2d 145, 149.

89. In only a single case have we even suggested that a finding of probable cause, apart from a consideration of all the evidence produced in the hearing, is by itself a sufficient ground for concluding that the arrest was not undertaken for an illegitimate purpose. Presley v. City of Monticello, 5 Cir., 1968, 395 F.2d 675, 676. In that case, however, other testimony refuted the claim. While the petitioner contended that he had been arrested only for trying to use a "white only" restroom at a service station, there was independent evidence establishing that he was loud and had been drinking. There is no equivalent evidence here.

90. See, e. g., note 104, *infra*.

91. In connection with an equivalent problem involving the propriety of injunctive relief under the Voting Rights Act of 1965, Judge Wisdom has pointed out that "the Act does not exempt from its prohibition acts directed against persons guilty of crime. It does exempt acts done for purposes other than interfering with the right to vote. It is here that the probable guilt or innocence of the person arrested becomes relevant. If the person is clearly guilty, the probability that the police have acted for a legitimate reason is much greater than it is if the arrest is clearly baseless." United States v. McLeod, 5 Cir., 1967, 385 F.2d 734, 744.

92. Perhaps the single greatest shortcoming of the District Court's opinion is that, while holding that the purpose of the arrests was *not* to intimidate the exercise of Federally protected rights, it does not once suggest any other conceivable legitimate motive that might have prompted the State's action here. There can be no such suggestion, of course, because there are no legitimate motives underlying these arrests and prosecutions.

93. "When the fact-finder has failed to employ the proper legal standard in making its determination the finding may not stand." Ferran v. Flemming, 5 Cir., 1961, 293 F.2d 568, 571; United States v. Pickett's Food Service, 5 Cir., 1966, 360

testimony is almost wholly uncontradicted by the State of Mississippi. No one, least of all the District Judge who conducted the hearing, has yet suggested or could suggest that it does not accurately and extensively present the full picture of what transpired during the Mendenhall march on U. S. Highway 49 and at the Rankin County jail on the night of February 7, 1970. Our prior decisions point the way. "Where there has been an adequate hearing and the *undisputed facts* show an utter absence of evidence to support the state charge, the proper cause is for this court to remand to the district court with directions to dismiss [the charge]." Walker v. Georgia, 5 Cir., 1969, 417 F.2d 1, 11.

### The Relevance of Circumstantial Evidence

Of course, when (as here) the conduct charged as a criminal offense is not the conduct immunized by Federal law against State criminal prosecution, the fact that there is not one shred of evidence to support the charges still does not automatically mandate a finding that the proceedings have been initiated exclusively for the proscribed purpose. As *Peacock* teaches, even false charges against individuals who have recently exercised equal civil rights are not removable on that showing alone. Moreover, if there is at least some evidence underlying the prosecutions, that fact may very well tip the balance in favor of the State, even though its action may have racially discriminatory overtones. The issue is the nebulous and evasive one of purpose or motivation, and in resolving it we must necessarily presume the legitimacy of the State's purpose and the purity of its motives.

But we must also take account of our own common experiences, not merely as Judges, but as men. When the Court states in its opinion that there is no

testimony that Baldwin knew the identities of the van's occupants when he stopped it, and refers to his "undisputed testimony" that he made a "routine traffic arrest," it is surely by implication prescribing a completely unrealistic standard of proof that could seldom be met, confined as it is to the testimony of the officer himself. No one but Baldwin could possibly have offered direct testimony of his intentions that afternoon on Highway 49. If the purpose of the arrests was in fact to forcefully injure, intimidate or interfere with the petitioners because they had participated in the Mendenhall demonstrations earlier in the afternoon, Baldwin would have been rather unlikely to admit it, particularly since the maximum criminal penalties for such conduct under § 245 are a $1,000 fine and imprisonment for one year when bodily injury does not result. We cannot obliquely require self-incriminatory testimony as a precondition to the vindication of Federal rights.

In assessing the legitimacy of the motives underlying official action we have previously recognized that the "coercive purpose cannot be proved by direct evidence. We must look to circumstantial evidence and develop a standard to measure the adequacy of the * * * proof." United States v. McLeod, 5 Cir., 1967, 385 F.2d 734, 741. Were we now suddenly to demand in every removal case an admission from the officers who made the illegal arrests and filed the frivolous charges, § 1443(1) would obviously shrink to no more than a useless appendage on the body of Federal civil rights law, a "remedy" in name only. Such an alternative does not easily commend itself for serious consideration.

Instead, we must consider all the relevant evidence, including that offered by the police officers, to determine whether the purpose of the arrests and charges was to intimidate Mendenhall demonstrators, rather than to enforce conced-

F.2d 338, 341; Dilworth v. Riner, 5 Cir., 1965, 343 F.2d 226, 232; Mitchell v. Mitchell Truck Line, Inc., 5 Cir., 1961, 286 F.2d 721; Henderson v. Flemming,

5 Cir., 1960, 283 F.2d 882; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512; Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186.

edly legitimate State criminal laws against reckless driving, resisting arrest and other varieties of impermissible conduct. The Court's opinion here makes a start in that direction by suggesting three factors tending to prove a lawful purpose: (i) Huemmer had never had any previous encounter with Officer Baldwin prior to his arrest on Highway 49, (ii) neither Huemmer nor any of the other demonstrators had previously been arrested in Mendenhall, and (iii) the second vehicle following the Huemmer van was not stopped.[94] The Court then finds that this evidence "supports the finding that these individuals were not arrested because of their exercise of First Amendment, or other, Constitutional rights."

But this analysis, correct as far it goes, does not go nearly far enough. In considering the circumstantial evidence we must also necessarily consider the circumstances.

Advocacy of social equality between the white and black races—the activity involved in the Mendenhall demonstrations and sheltered against prosecution by Title I of the Civil Rights Act of 1968—is a criminal offense in Mississippi.[95] On the date of the events in question all Mississippi law enforcement officers were under a statutory duty imposed by the State Legislature to "lawfully" prohibit any attempt to cause "a mixing or integration of the white and Negro races in public schools, public parks, public waiting rooms, public places of amusement, recreation or assembly" in the State.[96] While that statute was in ef-

94. By implication the Court also suggests that the subsequent three arrests at the Rankin County jail were motivated by legitimate purposes because the act by three black men of parking a car containing firearms in front of a Mississippi jail on a Saturday night, while not illegal in itself, was nevertheless under the circumstances improvident, immoral or "belligerent." Even conceding all that, arrests for improvidence, immorality or belligerence are still not justified under State law and, in this case, under Federal law as well.

95. "Races—social equality, marriages between—advocacy of punished.

Any person, firm or corporation who shall be guilty of printing, publishing or circulating printed, typewritten or written matter urging or presenting for public acceptance or general information, arguments or suggestions in favor of social equality or of intermarriage between whites and negroes, shall be guilty of a misdemeanor and subject to a fine not exceeding five hundred dollars or imprisonment not exceeding six months or both fine and imprisonment in the discretion of the court." Miss.Code Ann. § 2339.

96. "§ 4065.3. Compliance with the principles of segregation of the races.

1. That the entire executive branch of the government of the State of Mississippi, and of its subdivisions, and all persons responsible thereto, including the governor, the lieutenant governor, the heads of state departments, sheriffs, boards of supervisors, constables, mayors, boards of aldermen and other governing officials of municipalities by whatever name known, chiefs of police, policemen, highway patrolmen, all boards of county superintendents of education, and all other persons falling within the executive branch of said state and local government in the State of Mississippi, whether specifically named herein or not, as opposed and distinguished from members of the legislature and judicial branches of the government of said state, be and they and each of them, in their official capacity are hereby required, and they and each of them shall give full force and effect in the performance of their official and political duties, to the Resolution of Interposition, Senate Concurrent Resolution No. 125, adopted by the Legislature of the State of Mississippi on the 29th day of February, 1956, which Resolution of Interposition was adopted by virtue of and under authority of the reserved rights of the State of Mississippi, as guaranteed by the Tenth Amendment to the Constitution of the United States; and all of said members of the executive branch be and they are hereby directed to comply fully, with the Constitution of the State of Mississippi, the Statutes of the State of Mississippi, and said Resolution of Interposition, and are further directed and required to prohibit, by any lawful, peaceful and constitutional means, the implementation of or the compliance with the Integration Decisions of the United States Supreme Court of May 17, 1954 ([Brown v. Board of Edu-

fect this Court had occasion to consider at least one instance in which a deputy sheriff overzealously carried out his duty by conspiring with the Ku Klux Klan to murder three young civil rights workers.[97] And the law itself was no more than a pale reflection of what Judge Wisdom has termed Mississippi's "steel-hard, inflexible, undeviating official policy of segregation." United States v. City of Jackson, 5 Cir., 1963, 318 F.2d 1, 5, on rehearing, 320 F.2d 870.[98]

### What the Record Reveals

This is the context. Now for a quick recap of the testimony offered by the petitioners: a vehicle carrying 18 blacks and 2 whites is stopped by a Mississippi Highway Patrolman a few hours after all of its occupants have participated in a peaceful march protesting racial discrimination in a nearby town. The Highway Patrol has kept the march under rigorous surveillance, and one of the vehicle's passengers notices a patrol car following them out of town.

After placing the driver of the vehicle in the patrol car, the officer asks him whether he and his passengers were participants in the demonstration. Upon receiving an affirmative answer, the patrolman threatens his subject, refers to the passengers as "niggers," and then radios for assistance. He calls to two of the vehicle's occupants who have gotten out, "You niggers get back in that van." They do.

A few minutes later between four and six patrol cars pull up, and the officers get out with drawn guns. Rather than ticketing the driver for a minor traffic offense, they arrest him and his passengers, handcuff them, and take them to jail. The driver claims that on the way

cation] 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873) and of May 31, 1955 ([Brown v. Board of Education] 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083), and to prohibit by any lawful, peaceful, and constitutional means, the causing of a mixing or integration of the white and Negro races in public schools, public parks, public waiting rooms, public places of amusement, recreation or assembly in this state, by any branch of the federal government, any person employed by the federal government, any commission, board or agency, of the federal government, or any subdivision of the federal government, and to prohibit, by any lawful, peaceful and constitutional means, the implementation of any orders, rules or regulations of any board, commission or agency of the federal government, based on the supposed authority of said Integration Decisions, to cause a mixing or integration of the white and Negro races in public schools, public parks, public waiting rooms, public places of amusement, recreation or assembly in this state.

2. The prohibitions and mandates of this act are directed to the aforesaid executive branch of the government of the State of Mississippi, all aforesaid subdivisions, boards, and all individuals thereof in their official capacity only. Compliance with said prohibitions and mandates of this act by all of aforesaid executive officials shall be and is a full and complete defense to any suit whatsoever in law or equity, or of a civil or criminal nature which may hereafter be brought against the aforesaid executive officers, officials, agents or employees of the executive branch of State Government of Mississippi by any person, real or corporate, the State of Mississippi or any other state or by the federal government of the United States, any commission, agency, subdivision or employee thereof."

The Legislature repealed this statute on April 3, 1970. See S.B. 2380, Adv. Sheet, Gen.Acts, 1970 Sess., No. 7, p. 4. At the same time it also repealed criminal laws providing for racially segregated railroad cars, toilet facilities, and waiting rooms for common carriers. Laws, 1970, ch. 374, § 2.

97. See note 74, *supra*. The murders of Schwerner, Goodman and Chaney provided significant impetus for enactment of § 245 and were repeatedly mentioned during debate on the measure in Congress. See, e. g., 114 Cong.Rec. 9589–90 (1968) (remarks of Congressman Ryan).

98. "We find that terror hangs over the Negro in Mississippi and is an expectancy for those who refuse to accept their color as a badge of inferiority." Report of the Mississippi Advisory Commission to the U. S. Commission on Civil Rights, Administration of Justice in Mississippi 23 (1963).

he is beaten by a Highway Patrolman who has previously made threats to do precisely that, or worse, if he did not give up his civil rights activities.

Two of the Negro leaders of the protest march and a third black man, hearing of the arrests, go to the jail for the purpose of posting bond for those arrested. After parking in front of the jail and getting out of their car they are immediately arrested by 12 officers and taken inside. One of them is beaten on the way.

Once inside the jail two of the three prisoners and the driver arrested earlier are beaten with blackjacks, kicked, punched and verbally abused. During these proceedings the county sheriff forces the leader of the afternoon demonstration to read the demands made by his group, after telling him that he is a "smart nigger" and that his presence in the county constitutes "a whole new ballgame." The sheriff's son, who earlier participated in the Highway Patrol surveillance of the demonstration, is in the jail at the time, as are approximately 15 other law enforcement officers.

Subsequently two of the three organizers of the civil rights march have their heads shaved, and the sheriff himself pours moonshine whiskey over one of them. The prisoners are then kept in jail overnight and most are released the following day, although one—whose head has been split open with a blackjack—remains in jail all day Sunday and is finally released on Monday after posting the $5,000 bond demanded by the sheriff.

The State of Mississippi counters with the claim that it is all a coincidence and produces one witness—the sheriff—who denies that he struck anyone with a blackjack, a denial similar to one he has made six years earlier under similar circumstances. The sheriff says that after the civil rights leader swung at him he responded with two or three blows of his fist and that there was a general disturbance. Although he was in the room at the time, the sheriff cannot say "who hit who." The sheriff denies that any of his men were drinking because he doesn't allow it. The sheriff admits that he personally poured moonshine whiskey on one of his prisoners after ordering their heads shaved.

There are many other major and minor details, of course, but these are the highlights. My conception of a "routine traffic arrest" is at variance with the Court's. As a Judge I cannot be blind to what everyone else can see. United States v. Mississippi, S.D.Miss., 1964, 229 F.Supp. 925, 998 (dissenting opinion), reversed, 1965, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed. 2d 717.[99]

### The Charges

Certainly no violation of Federally protected rights is involved simply because a vehicle is stopped for a routine traffic violation. Police officers enforcing the traffic laws of their State are not at all hampered by the coincidence that the driver they are ticketing may have happened at some time in the near or remote past to have taken part in activities that Congress has seen fit to immunize against official intimidation. Such collateral incidents do not by themselves show the intimidatory purpose requisite for removal relief.[100]

As I have pointed out, however, the petitioners here have shown much more. They have established that even though Patrolman Baldwin may not have known who they were prior to stopping the van, he was aware of their identities before

---

99. In N. A. A. C. P. v. Thompson, *supra*, note 84, the Court concluded on the basis of similar facts that Federal injunctive relief against the municipal officials of Jackson was warranted despite a holding by the District Court that it was not. "The record discloses a pattern of conduct on the part of the officials of the city of Jackson that leads us to the conclusion that defendants took advantage of every opportunity, serious or trivial, to break up these demonstrations in protest against racial discrimination, and that a large number of the arrests had no other motive, and some had no justification whatever, either under municipal, State, or Federal law." 357 F.2d at 838.

100. See note 50, *supra*.

he arrested them and took them all into custody with the assistance of the officers he had called.[101] They have demonstrated that Sheriff Edwards likewise knew before he beat them up that his three late arrivals included the two black leaders of the Mendenhall civil rights movement. They have presented abundant evidence that the sequence of events beginning on Highway 49 and ending in cells at the Rankin County jail was not simply an unforeseen coincidence arising only from a legitimate effort to enforce State traffic laws. To this extent they have gone far toward proving the necessary causal relationship between the afternoon protest demonstration and the subsequent mass arrests several miles and several hours later.

And yet, thus far, we have not even directly considered the most crucial fact of all: the undisputed and indisputable lack of any evidence whatever to support the criminal charges against the defendants. If there were some evidence—*any* evidence—tending to show that any of the petitioners committed a criminal offense, it might at least have some bearing on the otherwise uncontested inferences to be drawn from the circumstances previously described. We need not try the defendants here in order to consider the point. The question is not whether they are innocent or guilty. It is simply whether there are *any* facts in this record, no matter how tenuous or remote, suggesting that the criminal charges have been brought in good faith for the justifiable purpose of enforcing Mississippi law.

There is no such evidence. At the hearing in the District Court the petitioners presented overwhelming proof that all of the charges pending against them are totally without foundation. Rather than attempting to counter this massive barrage of testimony, the State of Mississippi stood virtually mute. Under such circumstances silence by itself constitutes evidence of the most convincing character. *Interstate Circuit, Inc. v. United States*, 1939, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610, 620.

Considered from this perspective we must conclude that Douglas Huemmer and his 19 passengers were arrested and charged and now face prosecution in the State courts because—and *only* because—they had participated earlier in the day in the Mendenhall protests, activities immunized against official intimidation by the Civil Rights Act of 1968. Rev. Perkins, Rev. Brown and Buckley were similarly treated because—and *only* because—they had dared to exercise their Federally protected right to protest racial segregation in Simpson County. There is simply no other rational explanation to account for what happened.[102]

### The Highway 49 Arrests

The pending State prosecutions against Huemmer's 19 passengers involve two charges: (i) resisting Huemmer's arrest, and (ii) possession of a concealed deadly weapon, which Baldwin's arrest ticket describes as a brick. Huemmer is charged with (i) resisting his own arrest, (ii) brick-carrying, and (iii) reckless driving.

### Passive Resistance

The first charge is preposterous. The students testified that the group was

101. See note 13 and text, *supra.* For some inexplicable reason the Court has apparently assumed that the critical issue is whether Baldwin knew when he *stopped* the van that it contained the Mendenhall demonstrators. Of course, absence of knowledge at that point is irrelevant. The question is whether the defendants subsequently were arrested, taken into custody and prosecuted only because of their participation in the Mendenhall demonstration. Before any of that transpired the arresting officers knew their identities.

102. The conclusive character of the circumstantial evidence presented here is even stronger than that in United States v. McLeod, *supra,* note 91, where the Court concluded that "a baseless arrest and prosecution of a person prominently active in a voting drive compels the in-

quiet and orderly.[103] By Baldwin's own account none of the 19 did or said anything whatever that could rationally have been construed as resistance to Huemmer's arrest, nor did Huemmer. In fact, in his testimony Baldwin was unable to satisfactorily explain why he had arrested any of them at all,[104] other than by suggesting that "someone"—not everyone, or most of them, or even two, but *someone*—had requested the arrest.[105] Such a request, even if "someone" had

ference of an unlawful purpose to interfere with the right to vote." 385 F.2d at 744–745.

103. For example, Manorris Odom testified as follows:

"Q Mr. Odom, did you do anything at all to interfere with the duty of the highway patrolman on the scene?

A No I did not because when I was ordered to get out of the van there were at least four or five patrolmen out on the ground and who was going to do anything when the patrolmen had guns?

Q Did you hear any student make a threat or make any obscene gesture to the officers?

A No, I did not.

Q Was the group loud?

A No they weren't.

Q Did the group curse?

A No, they did not."

(Tr. 238.) This testimony was confirmed by Jacqueline Johnson, one of the other students. Neither Baldwin nor anyone else refuted it.

104. "Q Now Officer none of the people in the van actually resisted your arrest there at Plain, did they?

A No." (Tr. 153.)

\* \* \* \* \*

"Q Now, why did you arrest these people that got out of the van, Officer?

A Well when they got out of the van I felt like they were putting my life in jeopardy.

Q When they got out of the van did they have any weapons in their hands?

A Not that I saw, but you couldn't look at anybody 10 feet and tell where they've got weapons or not.

Q Did they make any threats directly to you?

A Not directly, no."

(Tr. 148.)

\* \* \* \* \*

BY THE COURT: Well I want to find out this. This man that was driving the car, did he resist arrest?

BY THE WITNESS: He did when we got him to jail.

BY THE COURT: He didn't resist when you stopped him?

BY THE WITNESS: No sir, I didn't have him charged with resisting arrest when I stopped him.

BY THE COURT: You just charged him with the traffic violation?

BY THE WITNESS: Yes, sir.

BY THE COURT: All right, as of that time, at the original time of this traffic violation, did anybody else, anybody referring to the passengers on that bus, did anybody else do anything toward resisting arrest?

BY THE WITNESS: No, nobody.

BY THE COURT: But nevertheless, you arrested all of them?

BY THE WITNESS: Yes, sir.

BY THE COURT: What did you arrest them for?

BY THE WITNESS: I arrested the ones outside for interfering with my duty, that's the only charge that I had at that time.

BY THE COURT: That's what I'm trying to find out. What were they doing? What were they doing to interfere with your duty?

BY THE WITNESS: Well they started coming out of the truck after I told them to get back in. Just the driver of the truck was out there and myself, and if more of them got out there was a chance that they put my life in jeopardy right there.

\* \* \* \* \*

BY THE COURT: All of them, including these eight that got out last, didn't do anything at that time toward resisting arrest? Is that right?

BY THE WITNESS: Yes, sir.

BY THE COURT: But nevertheless, you charged them with resisting arrest?

BY THE WITNESS: I didn't charge them with that at the scene.

BY THE COURT: That's what I'm getting after. You did not charge them with resisting arrest at the scene. It was at the jail that you charged them with resisting arrest, is that what you're talking about?

BY THE WITNESS: At the jail, yes, sir."

(Tr. 159–62.)

The District Court concluded that "the patrolman was very vague and indefinite in his testimony about the participation of the nineteen students in resisting arrest \* \* \*." (App. 29.)

105. See note 10, *supra*.

made it, could not have validated an otherwise illegal arrest of that person. Pierson v. Ray, 1967, 386 U.S. 547, 558, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288, 297.

Baldwin might have been attempting to advance the explanation that Huemmer and the others did not actually resist their arrests on the highway but waited until later, presumably for a more appropriate moment, until they were actually inside the jail.[106] This explanation is patently frivolous in view of the fact that the arrests obviously took place on the highway, not within the security of the Rankin County courthouse. If somehow the custody (including handcuffs) and restraint of the prisoners' liberty did not constitute an arrest until after the defendants were actually at the jail—and such a supposition is utterly incredible—resistance there *still* could not be characterized as "resisting arrest" if the prisoners were unlawfully confined or restrained in the first place. It is not a crime in Mississippi to resist an unlawful arrest but only to "obstruct or resist by force, or violence, or threats, or in any other manner, [a] *lawful* arrest or the *lawful* arrest of another person." Miss. Code Ann. § 2292.5 (emphasis added). "The offense of resisting arrest presupposes a lawful arrest. A person has a right to use reasonable force to resist an unlawful arrest." Smith v. State, Miss. S.Ct., 1968, 208 So.2d 746, 747 and cases cited therein. On the basis of this decision alone we may discount as absurdities all charges of resisting arrest.

## The Concealed Deadly Brick

With regard to the concealed deadly weapon charge, I assume that the Mississippi Legislature has not yet resolved to characterize the simple possession of a brick as a criminal offense, or to stigmatize every bricklayer as a potential criminal. Certainly the State's concealed weapons statute,[107] which particularly enumerates a wide variety of prohibited items, does not mention bricks, either generally or specifically. If it did mention bricks there would still be no basis for concluding that merely riding as a passenger in a vehicle containing a brick constitutes actual or constructive possession of it. No one held a brick, or brandished one, or used one in a menacing manner to threaten any of the officers. There was simply a brick in the van—that's all.

The District Judge adopted a slightly different approach. He found that there was probable cause for the arrest of the 19 students "for resisting arrest and having a least constructive possession of a *shotgun* in the vehicle at the time when one or more of them announced their decision that all or none of them should be taken to jail; or stated that defiantly, that if one of them was arrested all of them would have to be arrested and it must be realized that this patrolman was alone and of a different race, on a country road and in the presence of a very hostile and disrespectful group who had the 'difference' with them in the form

106. Unfortunately, he also admitted that he had seen no one resisting arrest there (Tr. 167). Moreover, all of the charges against the students were returnable to the Justice of the Peace at Florence, who had jurisdiction over that point at Highway 49 where the van was stopped, and all of the arrest tickets showed Plain as the location of the alleged offenses.

When asked why he had charged John Smith with resisting arrest (see Appendix A), Baldwin could not remember and doubted whether he could even identify that individual (Tr. 164).

107. "Carrying of deadly weapons.
Any person who carries, concealed in whole or in part, any bowie knife, dirk knife, butcher knife, switchblade knife, metallic knuckles, blackjack, slingshot, pistol, revolver, or any rifle with a barrel of less than sixteen (16) inches in length, or any shotgun with a barrel of less than eighteen (18) inches in length, machine gun or any fully automatic firearm or deadly weapon, or any muffler or silencer for any firearm, whether or not it is accompanied by a firearm, or uses or attempts to use against another person any imitation firearm, shall upon conviction be punished as follows * * *." Miss. Code Ann. § 2079.

of a shotgun to back up their decisions." (App. 33) (emphasis added).

This statement is unusual in several respects. In the first place there was no direct testimony that the van contained a shotgun,[108] much less a shotgun the possession of which was unlawful under the Mississippi concealed weapons statute, and there was no evidence of any kind that such a shotgun (if it actually existed) was concealed or that it was in either the actual or constructive possession of any or all of the prisoners, or that Baldwin based his arrest on possession of a shotgun, or that any of the prosecutions involved possession of a shotgun rather than the brick referred to in Baldwin's arrest tickets as the basis for the arrests.[109]

Moreover, the District Court's characterization of the conduct of the group as "defiant," "hostile" and "disrespectful" finds no support whatever in the record.

There is simply no testimony to justify the use of such adjectives. And I assume this Court would be unwilling to sanction a finding of probable cause based solely upon the fact that the officer was "alone and of a different race," particularly since the actual arrests were not made until after at least four to six of his fellow officers had arrived on the scene with their pistols drawn. Of course, they were all white.

### The Reckless Driver

Baldwin allegedly *stopped* Huemmer for reckless driving. But by his own admission he *arrested* him and took him into custody (rather than simply giving him a ticket) not because of his driving but "because of his passengers" (Tr. 140). Yet Baldwin's testimony [110] by itself conclusively establishes that there was no foundation for the charge because Huemmer was not driving in the

---

108. Baldwin made no reference to the mythical shotgun on direct examination. On cross examination he testified in response to a leading question by the State that Huemmer had told him in the patrol car that the van contained a shotgun (Tr. 173). Judge Cox overruled the objection that the testimony was hearsay and not admissible, then proceeded to base his finding of probable cause on it. There is no other evidence to support the finding that there was a shotgun in the van. *But see* note 109.

109. There was apparently a mix-up in the Mississippi law enforcement backfield at this point. Sheriff Edwards' testimony was that "someone" with the Highway Patrol delivered to his office several items allegedly taken from Huemmer's van, including several knives, two forks with the middle tines turned down, and a pistol (rather than a shotgun) (Tr. 334). None of the defendants were arrested for or charged with possession of any of these items. The "knives" the sheriff referred to were silverware (Tr. 336). As for the forks, see note 18, *supra*.

110. "Q Well, I'm asking you what your testimony is. What are the facts of the situation? What did you see the van do in terms of the facts, what were the motions of the van?

A He was going from the right hand lane to the left lane and back and weaving.

Q Now, when you say weaving you mean he was going from the right hand lane to the left hand lane and back again, is that right?

A Not completely in the left hand lane but enough to take up both of the lanes, and back.

Q Now, how many times did you see the van do that?

A Several.

Q Several times, now could you give us the number on that?

A No.

Q Was it twice?

A Could have been.

Q Was it more than twice?

A It's possible.

\*     \*     \*     \*     \*

Q Well you said you saw the van changing lanes several times, is that once?

A *No sir, he didn't change lanes.*

Q He didn't change lanes?

A I said he was weaving back and forth.

Q I believe it was your earlier testimony that the van was changing lanes?

A He didn't go completely in the left hand lane, he went far enough over to block both of the lanes.

\*     \*     \*     \*     \*

A Well the white van crossed the center line and almost hit that car.

"reckless" manner proscribed by the statute.[111] As the Mississippi Supreme Court has held in a situation involving negligent collision:

"The most favorable view that can be taken of the state's evidence is that the accused neglected to be on a constant lookout to see an approaching vehicle in time to stop his car before striking it. There is no proof that he was driving in a reckless manner or at a rate of speed such as to indicate a wilful or wanton disregard for the safety of persons or property. * * * At most, he was shown to be guilty of mere negligence, and liable only in a civil action. It was evidently not the purpose of the statute here involved to punish as criminal such acts of simple negligence, or even where gross negligence is shown, in traffic accidents unless it is of such character as to evince a wilful or wanton disregard for the safety of persons or property on the highways."

Sanford v. State, 1944, 195 Miss. 896, 16 So.2d 628, 629; see also One 1948 Pontiac Automobile v. State, 1954, 221 Miss. 352, 72 So.2d 692, 696; Gause v. State, 1948, 203 Miss. 377, 34 So.2d 729, 730. If an actual collision, standing alone, is not sufficient to establish the offense, Huemmer could hardly have committed the offense by merely *almost* having a collision, particularly when Baldwin admitted that Huemmer was not drunk and was not speeding (Tr. 121, 141).[112]

### The Rankin County Jail Arrests

Rev. Perkins, Rev. Brown and Joe Paul Buckley were charged with three offenses: (i) inciting to riot, (ii) resisting their own arrests at the jail, and (iii) possesson of a concealed deadly weapon. Their mission was a peaceful one—to post bond for those who had already been arrested and who were inside the jail. Of course one might assume, as the Court apparently does, that the mere fact of even lawfully carrying weapons in an automobile to a parking space in front of a Mississippi jail on a Saturday night somehow justifies the arrests of the three men who drove the car and rode in it as passengers. But I believe we may safely discount any implication here that Rev. Perkins—the father of eight children, an ordained

Q All right, could you see how far across the center line the white Dodge van went?

A His left two wheels crossed the center line.

* * * * *

Q Now does the Highway Patrol have any written instructions or policies as to when to take the driver of a vehicle to jail or when to give him a ticket and let him go on?

A I don't know of any.

Q Now, what is your policy, Officer Baldwin?

A I don't particularly have a policy on it.

Q Is it highly in your own discretion as to when to do that?

A Yes."

(Tr. 129, 130, 138, 139–40.) (Emphasis added.)

111. Miss.Code Ann. § 8175 defines the offense as the driving of "any vehicle in such a manner as to indicate either a *wilful* or a *wanton* disregard for the safety of persons or property" (emphasis added).

112. By citing Barnes v. State, 1964, 249 Miss. 482, 162 So.2d 865 for the proposition that Huemmer's arrest was supported by probable cause, the Court here falls into the same error that the District Court committed by assuming that a finding of probable cause is conclusive, or almost conclusive, on the issue of removability. The question is *why* Huemmer was arrested, not whether the arrest was technically, legal. The Civil Rights Act of 1968 does not exempt arrests made with probable cause from the scope of its prohibition if their only purpose is to interfere with the exercise of Federally protected rights.

Significantly, however, the *Barnes* case does not even support a finding of probable cause because the opinion contains no explicit statement of the facts involved there. Whatever the term "wobbling and swaying" meant on the record before the Mississippi Supreme Court, it obviously entailed much more than simply crossing a lane divider "several times" over a distance of four or five miles, which was the only evidence of Huemmer's "recklessness."

minister and the acknowledged leader of the civil rights movement for an entire Mississippi county—had any unlawful purpose in mind.

While the opinion of the District Court states that the men "sought in an attitude of belligerency to extricate [the prisoners] from their custodian" (App. 30), this is merely one more assertion that finds no support whatever in the record. It is contradicted by the testimony of one of the arresting officers (see note 117, *infra*).

The District Court also found that Rev. Perkins, Rev. Brown and Buckley were advised by the sheriff that a black attorney was coming from Jackson to make bond for the prisoners and that Sheriff Edwards "requested that such matters be allowed to follow their regular course by awaiting the arrival of this attorney with these bonds." (App. 30–31.) The relevant testimony by the sheriff on this point is as follows:

"* * * During the time that these were being booked I was advised by one of the patrolmen that there was a second bus load that had arrived outside, I asked some of the officers if they were under arrest and if they were in custody and they said they weren't. I called one of my deputies and told him for him and one or two of the State's boys to go out there and tell these people that they weren't charged with anything and that the attorney knew that we had these other subjects there, for them to advise them to leave, *they couldn't make them leave,* but I told them to advise them

to leave, that they had no business here at this time of the night. * * * So they were advised and then I was advised that they had gone * * *." (Tr. 324–25.) (Emphasis added.)

From these statements alone the Trial Judge apparently inferred (i) that the sheriff "told" Rev. Perkins, Rev. Brown and Buckley that an attorney (who actually did not arrive until the next morning) was on the way, and (ii) that the three men knew before they were arrested that an attorney had been notified. Obviously neither of these inferences is warranted.[113]

### Inciting to Riot

This charge comes closest to describing what actually happened inside the jail when the sheriff and his deputies employed "rather violent force" against their prisoners. Under Mississippi law a riot is defined as "any use of force or violence disturbing the public peace, or any threat to use such force and violence, if accompanied by immediate power of execution, by two (2) or more persons acting together and without authority of law."[114] "Inciting to riot" is "the urging or instigating or leading [of] others to riot by *organizing* or *promoting* or *encouraging* others to participate in a riot."[115] Needless to say, there is no evidence whatever that any of the defendants "organized" or "encouraged" or "promoted" a riot while in the Rankin County jail. Although he was in the room during the entire period Sheriff Edwards could not even accurately describe the incidents that transpired after Rev. Perkins allegedly swung at him.[116]

---

113. The foregoing testimony by Sheriff Edwards is also the only basis in the record for this Court's assumption that the three men went to the parking place in front of the jail "after visiting hours." There is no other evidence even remotely suggesting what the jail's visiting hours (or the visiting hours for its parking places) were.

114. Miss.Code Ann. § 2361.5–01(A). Enacted in 1968, this felony statute apparently has not yet been judicially construed.

115. Miss.Code Ann. § 2361.5–01(B) (emphasis added).

116. "BY THE COURT: Who do you refer to as a melee breaking out?
BY THE WITNESS: That's when the fight broke out and the officers came on out when the licks were passed between Perkins and me Judge, and the officers came out and there was some hitting, I didn't see who hit who but there was a fracas." (Tr. 340–41.)

## Resisting Arrest

All three of the defendants were arrested outside the jail and then taken inside. The alleged offense of resisting arrest therefore must have taken place at Rev. Perkins' car, since once inside the building the prisoners had already been arrested and confined in the custody of between seven and twelve law enforcement officers. Yet the uncontradicted testimony of everyone,[117] including the sheriff,[118] is that no one resisted arrest before the trouble inside broke out. And if the three men were through some oversight not actually "under arrest" until they were inside the jail, Mississippi law still gave them "a right to use reasonable force to resist an unlawful arrest." Smith v. State, *supra*. On any theory this charge is thus totally groundless.

## The Shotgun

Rev. Perkins and the other two defendants were also charged with carrying a concealed weapon, described in the charging affidavit of the arresting officer as a 12-gauge shotgun (see Appendix B). Carrying an ordinary shotgun, whether concealed or not, is not a crime in Mississippi,[119] and there was no evidence suggesting that the barrel of Rev. Perkins' shotgun was sawed off so as to bring it within the State's concealed weapons statute. In any event the uncontradicted testimony is that the weapons in the car were not concealed,[120] and there is likewise no dispute that when the men got out of the automobile the weapons remained inside until after they were arrested. Neither Rev. Brown nor Buckley was ever in either actual or constructive possession of any firearm, having merely been passengers in the vehicle, and under Mississippi law Rev. Perkins was entitled to carry even a *concealed* weapon because of previous threats to his life.[121] There is grim irony in the fact that the Mississippi Supreme Court has held that a complete defense

117. Officer Lloyd Jones of the Highway Patrol, who observed the Mendenhall march in the afternoon and then showed up at the Rankin County jail in time to help arrest Rev. Perkins and his associates, testified as follows:

"Q Now did any of these three give you any trouble at the time they were arrested?

A Not me, no sir.

Q They came along with you all right?

A Yes sir." (Tr. 181.)

Rev. Perkins testified that during the first Mendenhall march in December he and Jones had a "long conversation" in which "he did most of the talking because I was afraid, and he said a lot of things to me, things I wouldn't want to repeat in this court because of the ladies here." (Tr. 297.) Jones admitted that he had been given a copy of the Mendenhall protest demands and that he had read them (Tr. 99–100).

118. "Q And there had been no trouble prior to [the fight]?

A That's right.

Q No resisting of arrests?

A Up until that time there had been no trouble, that's right." (Tr. 341.)

119. See note 107, *supra*; cf. United States v. Pearson, 5 Cir., 1971, 448 F.2d 1207, 1213 ("One quick glance at these bolt-action full barrel rifles would have been enough to inform an officer that their possession was not prohibited under Mississippi law.").

120. Rev. Brown testified that earlier he had told Inspector Jones and a local FBI agent that the men were carrying guns for their own protection "up behind the back seat" in open view (Tr. 281).

121. Miss.Code Ann. § 2081(a) provides that a person charged with carrying a concealed deadly weapon may establish as a defense "that he was threatened, and had good and sufficient reason to apprehend a serious attack from any enemy, and that he did so apprehend." Rev. Perkins testified that he "had received many phone calls, threats, and it was widely known in Mendenhall that there were people offering thousands of dollars to kill me." (Tr. 301.)

Of course, Rev. Perkins did carry a pistol in his car, but he was neither arrested nor charged for that. As Sheriff Edwards testified (Tr. 325), all three men were arrested for the indisputably lawful possession of a shotgun and two rifles. Moreover, even if the pending prosecutions do in some way relate to the actual possession of a concealed weapon, the defendants obviously had "good and sufficient reason to apprehend a serious attack." The subsequent events inside the jail prove it.

to a charge of carrying a concealed weapon is made out by proof that the defendant was traveling or setting out on a journey taking him "beyond the circle of his friends and acquaintances." Morgan v. Town of Heidelberg, 1963, 246 Miss. 481, 150 So.2d 512, 516.

### "Routine Arrests"

The District Court made no explicit findings with respect to the credibility of any of the witnesses. The only factual issues that were really disputed— whether Rev. Perkins or the sheriff swung first and whether the officers were drinking—were never resolved. Instead, relying entirely upon findings of probable cause for the arrests, without referring specifically to any of the petitioners' testimony regarding their treatment on Highway 49 and at the Rankin County jail, and by-passing entirely the allegations in the removal petition that the prosecutions were groundless and instituted solely for the purpose of intimidating the defendants because of their previous exercise of § 245(b) rights,[122] the District Court simply remanded on the basis of a general conclusory finding that the defendants "were not arrested by these officers for doing anything which they had a federal right to do." The fact that there is no evidence at all to support any of the charges was never even considered.

This Court is not required to sanction a finding so obviously the product of the District Court's misapprehension of the appropriate legal standard to be utilized in making it. The proper course would be to direct dismissal of the prosecutions since "there has been an adequate hearing and the undisputed facts show a valid case for removal." Walker v. Georgia, 5 Cir., 1969, 417 F.2d 1, 5. But at the very least the Trial Court should be required to make new findings based upon a correct application of the law to the facts.

### Epilogue

Like Screws v. United States, 1945, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, "this case involves a shocking and revolting episode in law enforcement." It also provides us with still another classic example of the misuse of State criminal procedures for the sole purpose of intimidating the exercise of equal civil rights,[123] precisely the situation that § 1443(1) and *Rachel* were designed to correct. Yet somehow, for reasons not quite comprehensible to me, the Court concludes that civil rights removal jurisdiction should not be exercised and suggests that the appeal is wholly without merit.

Such a result is unfortunate enough on the facts now before us, but the precedent we set is even more ominous. Apparently any arrest that is "geographically and temporally remote" from the activities protected by § 245(b), no matter how plainly and exclusively motivated by the antecedent exercise of the Federal right to protest racial segregation, will automatically insulate the subsequent spurious criminal prosecution against a quick and painless death by removal to a Federal court, thereby encouraging the repetition of incidents like the present one. Our decision here is not merely incorrect. It is fundamentally inconsistent with the letter and spirit of the removal statute, the Civil Rights Act of 1968, and the constitutional guarantees underlying them.

I dissent. I would vacate the District Court's order and remand all of these prosecutions with instructions to dismiss the charges.

---

122. See note 68, *supra.*

123. See note 75, *supra.*

## APPENDIX A — THE HIGHWAY 49 ARRESTS

| Petitioner | Offenses Charged in Arrest Tickets of Patrolman D. O. Baldwin (Plaintiffs' Exhibit P-4) | Offenses Charged in Charging Affidavits of Patrolman D. O. Baldwin (R. 99-116; Pls. Ex. P-5) |
| --- | --- | --- |
| Douglas B. Huemmer | Reckless driving; concealed weapon; resisting arrest | Reckless driving; resisting his arrest; possession of concealed, deadly weapon |
| Alfonso Todd, Jr. | Interfering with duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer |
| Manorris Odom | Interfering with duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Ira Phil Freshman | Interfering with the lawful duty of a law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Larry L. Lowe | Interfering with duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Roy L. Irons | Interfering with duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| David Lee Nall | Interfering with duty of law officer; resisting arrest; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Rhonda Eulene Crisler | Interfering with lawful duty of law officer; concealed weapon (brick) | |
| Eugene M. Calhoun | Interfering with duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |

[A4900]

| Name | | |
|---|---|---|
| Benay Anne Garrett | Interfering with duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Stanford R. Love | Interfering with duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Lynda Eloise Smith | Interfering with lawful duty of law officer; concealed weapon (brick) | Possession of concealed, deadly weapon |
| John Wesley Smith | Interfering with duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Charity Louise Shaw | Interfering with law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Wilmer Standfield | Interfering with lawful duty of a law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Jacqueline Johnson | Interfering with lawful duty of a law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Loistine Hines | Interfering with duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Peggy Jo Hampton | Interfering with a lawful duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |
| Patricia Ann Wheeler | Interfering with the duty of law officer; concealed weapon (brick) | Possession of concealed, deadly weapon |
| Beverly P. Williams | Interfering with the duty of law officer; concealed weapon (brick) | Resisting arrest of Douglas B. Huemmer; possession of concealed, deadly weapon |

[A4902]

## APPENDIX B — THE RANKIN COUNTY JAIL ARRESTS

| Petitioner | Offenses Charged in Charging Affidavits of Deputy A. B. Martin (R. 117-123; Pls. Ex. P-5 |
| --- | --- |
| Rev. John M. Perkins | Inciting to riot; resisting his own arrest; possession of concealed, deadly weapon, a 12 gauge automatic shotgun |
| Rev. Curry Brown | Inciting to riot; resisting his own arrest, possession of a concealed, deadly weapon |
| Joe Paul Buckley | Inciting to riot; resisting his own arrest, possession of a concealed, deadly weapon |
| John Wesley Smith | Resisting his own arrest |
| Alfonso Todd, Jr. | Resisting his own arrest; possession of a concealed, deadly weapon |
| David Lee Nall, Jr. | Resisting his own arrest |
| Douglas B. Huemmer | Resisting his own arrest |

[A4903]

———◆———

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

It is ordered that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.